Larry LONG and Virginia Long,
Appellants (Plaintiffs),

v.

GREAT WEST LIFE & ANNUITY IN-
SURANCE COMPANY, a foreign corpo-
ration; Great West Life Assurance Com-
pany, a foreign corporation; and Linda
Carpenter, a resident of Wyoming, Ap-
pellees (Defendants).

No. 96–285.

Supreme Court of Wyoming.

April 20, 1998.

Rehearing Denied May 15, 1998.

John I. Henley and David A. Drell (argued) of Brooks, Henley & Drell, P.C., Casper, for Appellants.

Patrick J. Murphy of Williams, Porter, Day & Neville, P.C., Casper, for Appellees.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.

GOLDEN, Justice.

Appellants Larry and Virginia Long brought suit against Appellee Great–West, two unknown doctors employed by Great–West and an employee of Great–West, Linda Carpenter, after they refused to preauthorize surgery and, instead, advised Mr. Long to undergo an alternative procedure. The district court determined that Mr. Long's exclusive remedy was administrative which he had failed to exhaust and granted summary judgment to Great–West.

We reverse and remand.

## ISSUES

Long presents these issues:

I. The District Court inappropriately applied Wyoming Rule of Civil Procedure 56, and inappropriately considered and adopted untimely submitted, conclusory and contested evidence by the appellee in granting summary judgment.

II. Wyoming Statutes, 9–3–202, et seq., do not mandate that claims alleging torts and civil rights violations against appellees be held in abeyance until or forfeited because Larry Long's grievance contesting the imposition of a reimbursement penalty had not been heard by the State Employees' and Officials' Group Insurance Board.

III. The interpretation by the District Court of Wyoming Statute 9–3–205 is Unconstitutional.

IV. The basis for the dismissal has been corrected, the tort and civil rights claims should not have been dismissed with prejudice.

Great–West presents these issues:

1. Did the District Court correctly grant summary judgment where the state employee failed to exhaust, or even use, his administrative grievance remedy?

2. Did the district court correctly rule that it is constitutionally permissible for the legislature to limit a claimant to an administrative forum and remedy, and subsequent Rule 12 judicial review of that administrative remedy?

## FACTS

Larry Long is an employee of the State of Wyoming (employer) and participates in and pays premiums to a health insurance plan sponsored by the employer. The defendant, Great–West, administers the plan for the employer in accordance with an insurance contract issued to insured employees, contained in the Employee Benefit Booklet. The plan's terms accord Great–West virtually total control and discretion in the administration of the plan and, when claims are denied, provides for an appeal procedure to Great–West and a grievance procedure to the State Employees' and Officials' Group Insurance Board. As part of the benefit plan, Great–West provided participants with a list of physicians it calls a network with whom it has billing and treatment agreements.

Long's doctor, neurologist Dr. Hollifield, recommended that Long have back surgery for chronic pain that he had been experiencing for some time. The plan required preauthorization for the surgery, and because Dr. Hollifield is a non-network physician, Long had the responsibility of ensuring his doctor received preauthorization for the surgery. Preauthorization triggered the involvement of a telephone-based utilization review program, Health Care Review Service (HCRS), in the recommended treatment decision. It is not clear from the record whether the

utilization review is a program of Great–West or an independent service. On July 17, 1995, Long completed pre-admission at the hospital but received word the day before surgery that his doctor had canceled surgery because Great–West had withdrawn authorization for the surgery based upon the recommendation of HCRS. Under the contract, surgery performed without authorization would result in a payment penalty. Authorized surgery was paid at 80% up to $5,000.00 less deductibles and then 100% over $5,000.00, while unauthorized surgery would only be paid at 60% for all costs.

Although Great–West advised Long to contact HCRS for an explanation for the surgery cancellation, HCRS did not respond and that explanation was given to him first by Great–West and then by Dr. Hollifield after he spoke with HCRS. HCRS had determined that Long should receive the conservative treatment of steroid injections. Long and Dr.Hollifield scheduled the steroid injection treatment for July 21, 1995, with a board certified anesthesiologist, Mark Steffen, M.D. On that date, Dr. Steffen advised Long that ethically he could not administer the injections. Because Dr. Steffen believed that the injections would be of no physical benefit to Long and would involve some risk, Dr. Steffen concluded that he could not ethically subject Long to the additional medical intervention and then bill him for it.

On July 24, 1995, Long called HCRS requesting HCRS' fax number and address and information on the review process. An HCRS representative advised Long that he should make the statements directly to him as opposed to writing a letter; however, on July 25, Long faxed a letter to HCRS explaining that his doctor advised against the steroid treatments and another doctor had refused to administer the steroid injections. Long's letter commented that since HCRS seemed to be calling the shots he would welcome it if they arranged a medical consultation for him. He received a letter dated July 29, 1995, from Great–West stating again that surgery would not be authorized because of an inadequate trial of conservative therapy or insufficient diagnostic evaluation. On July 31, 1995, Long again called HCRS

and was advised that further grievance or appeal needed to be directed to the main benefit office of Great–West and was given an 800 telephone number. Long immediately called the 800 number and was then transferred to Cheyenne, where he talked with a "Lucy" who would not give her last name. She advised him to send a copy of the records and that they would be reviewed again in about three weeks. Long requested Dr. Hollifield's office to forward the material to the attention of "Lucy" at a post office box address in Cheyenne. At some point, Long was apparently advised that physical therapy was another alternative conservative treatment that his insurance deemed appropriate rather than surgery. On August 1, 1995, Long attended an appointment with Dr. Al Metz, a neurosurgeon in Casper. His examination of Long resulted in the following diagnosis as related to Dr. Hollifield:

His MRI films ... were reviewed ... [and] show a huge herniation at L4–5, occupying 60% to 70% of the spinal canal, greater on the left side.... The herniation is certainly impressive.

I told Mr. Long that I concurred with your recommendation for surgery. If this were a minor recurrence or if the postoperative films showed nothing but scar tissue, then I think a course of steroids would be indicated. I wonder if the steroids would even have access to this nerve root, because of the blocking effect of the disc and almost certainty of some postoperative scar around the nerve root. I have to applaud Dr. Steffen for his ethical stand on this matter. By the same token, physical therapy and other peripheral methods of addressing the secondary and tertiary effects of this herniation would simply be a waste of the patient's time, medical resources and money. It is a certainty that he would eventually have to undergo the appropriate surgical treatment anyway.

On August 3, 1995, Long wrote to Great–West and told it that his doctors had advised him that all pertinent medical records had been sent to Great–West for further study. The letter indicated that HCRS had told Long's doctors that physical therapy was an

acceptable alternative, but his doctors did not believe that it would be of any real benefit. Long then requested that Great–West inform him what type of physical therapy program was required and of what duration was needed to satisfy its requirement of conservative treatment. Great–West did not respond directly to that question but only replied in a letter dated August 7, 1995, that his claim had been forwarded to the head office for review. On August 24, 1995, Long wrote Great–West another letter stating that Dr. Hollifield had attempted to confer further with Great–West about the status of his care and had not received any reply. Long called or faxed other letters requesting a decision about his care several more times. On August 29, 1995, an employee for the Wyoming Employees' Official Group Insurance Office explained to Long that he had not received an answer because a preauthorization for surgery was not considered a claim and therefore there were no strict time constraints upon Great–West to make any decision.

During the period of time from his surgery authorization cancellation until September 8, 1995, Long's condition deteriorated. He suffered weakness in his left foot and the pain worsened to such an extent that he curtailed daily activities and reduced his hours each day at work. His gait became abnormal, he began to use a cane to assist his ambulation, and he experienced motor deprivation and sensory changes. On September 8, 1995, Long had the surgery. His claim for benefits was paid at the 60% penalty rate.

Long filed suit on May 2, 1996, alleging breach of contract, civil conspiracy, civil rights violation, unlawful practice of medicine, assault, intentional interference with contractual relationship, intentional infliction of emotional distress, violation of the duty of good faith and fair dealing, tort of outrage, and punitive damages. Great–West filed a motion to dismiss or for summary judgment, claiming Long had not exhausted his administrative remedies as required by Wyoming statute and the provisions of the insurance

contract. The trial court ruled that the contract called for Long to file a grievance when his claim was denied and that he had not properly filed such a grievance. Summary judgment was granted to Great–West. Long then filed a grievance with the Group Insurance Board for the denial of his claim for benefits at the contract rate. On October 22, 1996, before a hearing before the Board was held, Great–West withdrew its opposition to Long's claim for benefits after Sheridan, Wyoming, neurosurgeon Meredith Miller, M.D. reviewed and assessed Long's case and a medically necessary determination was made in favor of Long.[1] This appeal of the summary judgment order followed.

## DISCUSSION

Long contends that neither Wyoming statute nor the terms of his insurance contract provide that the grievance procedure involving the Board is the exclusive remedy for complaints against the utilization review process. He distinguishes between the utilization review process and the claim for benefits process, contending the former implicates Great–West's handling of a recommendation for a treatment alternative entitling him to a judicial remedy for breach of contract, tort, and civil rights claims while the latter, by contract, restricts his remedy to the appeal and grievance procedure for a denial of payment.

### Nature of Utilization Review

The past decade has produced a fundamental reorganization of this nation's health care delivery system. Its centerpiece is the managed care concept which contains costs by concurrent and prospective utilization review systems. Historically, our national health care delivery system consisted simply of a doctor-patient relationship involving "fee-for-service" where medical decisions were made by an attending physician and if made negligently resulted in a medical malpractice suit. Those patients who had medical coverage insurance traditionally had a retrospective indemnity insurance plan which reviewed

---

1. This Court granted the appellants' motion to strike post summary judgment events from consideration when determining the propriety of summary judgment; however, the occurrence of these events limited the issues presented on appeal and are noted for that reason.

claims for payment after treatment had occurred. Under this system, "[d]enial of a claim meant that the cost of treatment was absorbed by an entity other than the one designed to spread the risk of medical costs—the insurer." *Corcoran v. United HealthCare, Inc.*, 965 F.2d 1321, 1327 (5th Cir.1992), *cert. denied*, 506 U.S. 1033, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992); *see* Jonathan J. Frankel, *Medical Malpractice Law and Health Care Cost Containment: Lessons for Reformers from the Clash of Cultures*, 103 YALE L.J. 1297 (1994); Michael A. Dowell, *Avoiding HMO Liability for Utilization Review*, 23 U. TOL. L.REV. 117–18 (1991).

In past decades, health care costs rose dramatically and, by the 1980's, the third party payor system of private insurers had introduced patients and physicians to the managed care notion of cost containment in the form of concurrent and prospective utilization review systems. These systems have fundamentally shifted the way that health care is funded, organized and administered by involving a third party in cost-conscious medical decision-making. Typically, the provider of utilization review services reviews the treating physician's prescribed course of care and treatment plans, requires pre-admission certification for hospital stays, and monitors a hospital stay to determine its continuing appropriateness. Usually, the provider, who may or may not be a doctor, relies upon established clinical guidelines for a "statistical person" and does not have first-hand knowledge of the particular patient.[2] The cost of care that is not approved prospectively or concurrently is shifted to the patient or the treating physician in the case of a health maintenance organization. *Corcoran*, 965 F.2d at 1326; John D. Blum, *An Analysis of Legal Liability in Health Care Utilization Review and Case Management*, 26 HOUS. L.REV. 191, 192–93 (1989). Despite the involvement of the provider of the utiliza-

tion review process (provider), the medical malpractice liability of the treating physician does not change if injury or death occurs from inappropriate medical treatment. *Wickline v. State of California*, 192 Cal. App.3d 1630, 239 Cal.Rptr. 810, 819 (1986), *cert. granted*, 231 Cal.Rptr. 560, 727 P.2d 753, *review dismissed*, *cause remanded*, 239 Cal.Rptr. 805, 741 P.2d 613 (1987). However, the issue that has been created and which courts only recently have begun to explore is whether the provider can be held liable when a decision denying treatment causes injury or death. *Corcoran*, 965 F.2d at 1327; *Wilson v. Blue Cross of So. California*, 222 Cal.App.3d 660, 271 Cal.Rptr. 876, 883 (1990); *Pacificare of Oklahoma, Inc. v. Burrage*, 59 F.3d 151, 155 (10th Cir.1995). Although the attending physician is the ultimate decision-maker regarding a patient's treatment, it is, as commentators note, naive to assume that a provider's determination that recommended care is not medically necessary, and therefore not covered by insurance or the health plan, will not affect the treatment ultimately received by the patient. Anne J. Williams, Mark E. Reagan, *Managed Care Utilization Review: Is It the Practice of Medicine?*, INSIDE HEALTH LAW, Jan.1997; Pennsylvania Medical Society, *Utilization Review Safeguards*, Issue 5, Oct. 15, 1996; Vernellia R. Randall, *Managed Care, Utilization Review, and Financial Risk Shifting: Compensating Patients for Health Care Cost Containment Injuries*, 17 U. PUGET SOUND L.REV. 1, 34 (1993). As courts have recognized, imposing liability necessarily requires determinations that the provider has made a medical decision and that a mistaken conclusion about medical necessity in a prospective review process has effectively deprived the insured of necessary medical care. *Wilson*, 271 Cal. Rptr. at 883; *Corcoran*, 965 F.2d at 1331–32. *Corcoran* described the different impact of the systems in this way:

**2.** Clinical practice guidelines are defined as "systematically developed statements to assist practitioner and patient decisions about appropriate health care for specific clinical conditions." Medical practice guidelines must be distinguished from guidelines for utilization review which serve only a cost containment purpose. William R. Trail and Brad A. Allen, *Government Created Medical Practice Guidelines: The Opening*

*of Pandora's Box*, 10 J.L. & HEALTH 231, 234–36 (1996); Andrew L. Hyams, et al., *Medical Practice Guidelines in Malpractice Litigation: An Early Retrospective*, 21 J. HEALTH POL, POL'Y & L. 289, 304 (1996) (citing Grogan, C.M., et al., *How Will We Use Clinical Guidelines? The Experience of Medicare Carriers*, 19 J. HEALTH POL., POL'Y & L. 7, 26 (1994)).

A prospective decision is, however, different in its impact on the beneficiary than a retrospective decision. In both systems, the beneficiary theoretically knows in advance what treatments the plan will pay for because coverage is spelled out in the plan documents. But in the retrospective system, a beneficiary who embarks on the course of treatment recommended by his or her physician has only a potential risk of disallowance of all or a part of the cost of that treatment, and then only after treatment has been rendered. In contrast, in a prospective system a beneficiary may be squarely presented in advance of treatment with a statement that the insurer will not pay for the proposed course of treatment recommended by his or her doctor and the beneficiary has the potential of recovering the cost of that treatment only if he or she can prevail in a challenge to the insurer's decision. A beneficiary in the latter system would likely be far less inclined to undertake the course of treatment that the insurer has at least preliminarily rejected.

*Id.* at 1331–32.

The involvement of third party payors in medical decision-making has blurred the liability distinctions that the law has formerly made. Previously, malpractice actions addressed injuries caused by medical decisions, and bad faith tort actions addressed injuries caused by an insurer's improper investigations and payments of claims after medical treatment was received. The rules of law applicable to these causes of action do not address Long's complaint which is that Great–West made a medical decision that effectively denied him timely appropriate treatment, and no meaningful appeal of that decision was available in a timely fashion. Today, judicial decisions either hold that federal law completely preempts denial of treatment claims or permit medical malpractice actions against plan administrators in a limited fashion under various theories such as agency or vicarious liability. *Corcoran*, 965 F.2d at 1337–38; *Pacificare*, 59 F.3d at 155; *Tufino v. N.Y. Hotel & Motel Trades Council*, 223 A.D.2d 245, 646 N.Y.S.2d 799, 801–02 (1996)(listing cases).

The utilization review in Long's plan is characterized as a prospective review program requiring authorization before treatment is administered in order to receive the insurance contract rates. Failure to comply with the utilization review program results in an assessment of a penalty rate. In Long's case, three attending physicians, experts in the particular field, all concluded that the recommended course of treatment by doctors of HCRS was inappropriate and did not agree to the treatment. HCRS refused to change its medical decision to recommend steroid injection treatments, and Long, unable to receive the treatment, did not have surgery because of HCRS' decision. As his condition worsened, he had the surgery and suffered a payment penalty. At that point, a grievance procedure became available to him and, ultimately, after another independent review by a neurosurgeon, resulted in his receiving the full benefits to which he was entitled under his contract. Still, Long believes the medical decision by HCRS has created legal causes of action deserving trial. As described above, other courts have recognized that utilization review is medical decision-making, and a plan administrator that involves itself in a medical decision that amounts to a denial of treatment is making a medical decision. It has also been recognized that if the law requires a complaint system for utilization review decisions, the insurer must act in good faith in administering the complaint system that it has established. *Williams v. HealthAmerica*, 41 Ohio App.3d 245, 535 N.E.2d 717, 721 (1987). With this background, we examine Wyoming law concerning the duties of an insurer, the statute creating this particular insurance program and the contract language to resolve the sole issue for our review, which is whether Long's exclusive remedy for utilization review process decisions is administrative.

### Applicable State Law

As a preliminary matter, we must address Great–West's contention that it is not the proper party to be sued. The insurance contract suggests that HCRS is a Great–West program although the record does not clearly identify the relationship be-

tween the two. During oral argument, Great–West contended that it is not the proper party to be sued as it was merely a claims processor performing ministerial functions for the employer, the State of Wyoming. Under federal law, a third-party plan administrator that performs ministerial functions is not subject to suit because the law does not define it as a "fiduciary." *Santana v. Deluxe Corp.*, 920 F.Supp. 249, 253–54 (D.Mass.1996). An administrator that exercises discretionary authority or discretionary control in the administration and management of the plan may qualify as a fiduciary. *Id.*

■ Under state law, several theories are available that would subject Great–West to suit; however, there was no factual development on this issue before entry of summary judgment. The record does allow us to determine that a genuine question of material fact exists as to whether the terms of the insurance contract issued to Long created a fiduciary relationship between him and Great–West. The wording of Long's insurance contract would appear to contradict Great–West's contention that it is a mere claims processor. The contract informs the employee that Great–West provides the network of physicians and hospitals that permits an employee to receive maximum contract benefit rates. The contract also states that "HCRS is a telephone-based utilization review program, supervised by physicians and nurses, that helps you receive appropriate care for your condition and control your out-of-pocket costs." Employees are told that, among other services, HCRS will determine "the medical necessity of the treatment." Later in the contract, employees are told "Great–West may require proof in writing that any type of treatment, service or supply received is Medically Necessary. Medical necessity will be determined solely by Great–West." Such control and discretion as evidenced by the contract necessarily require that we consider whether a fiduciary relationship exists under these particular circumstances. We have said that "[f]iduciary duty is not created by a unilateral decision to repose trust and confidence; it derives from the conduct or undertaking of the purported fiduciary" and have defined a fiduciary as

"[a] person having duty, created by his own undertaking, to act primarily for another's benefit in matters connected with such undertaking." *Martinez v. Associates Financial Services Co. of Colorado, Inc.*, 891 P.2d 785, 790 (Wyo.1995). In describing fiduciary relationships, we have said:

> Of the two essential kinds of fiduciary relationships, the first arises from specific legal relationships. "In cases of trustee and beneficiary, principal and agent, and the like, the relations are essentially fiduciary, and the inference or presumption follows of course." ... The second is less susceptible of exact definition, being "implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions."

*Martinez*, 891 P.2d at 789 (citations omitted). There is a genuine question of material fact regarding Great–West's liability, and the order of summary judgment will not be upheld on the basis that Great–West's function was merely ministerial.

*Long's Claims*

Besides the breach of contract issues, we perceive Long's other numerous causes of action as being in the nature of a claim for bad faith in handling and investigating his claim for appropriate medical treatment.

■ In Wyoming, a breach of the implied covenant of good faith and fair dealing which rises to the level of an independent tort is actionable for compensatory and punitive damages under proper circumstances. *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855, 860–61 (Wyo.1990). Recovery is allowed because of a special relationship created by the unequal bargaining power that an insurer has over an insured. *Id.* at 858. The duty of good faith and fair dealing imposes an obligation "that neither party will do anything which will injure the right of the other to receive the benefits of the agreement." *State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 825 (Wyo.1994). "It is the obligation, deemed to be imposed by the law, under which the insurer must act

fairly and in good faith in discharging its contractual responsibilities." *Id.*

■ In *Williams,* it was held that acts which evidence a course of conduct by the insurer's plan administrator of disregarding its duties to the insured are sufficient to raise an issue of fact for a jury as to the insurer's lack of good faith. *Williams,* 535 N.E.2d at 721. In this case, Long specifically requested that the insurer provide him with the name of a doctor in his area who could perform the course of treatment that the insurer would cover and although the plan states that this information will be supplied, he did not receive an answer; Long specifically requested that the insurer provide him with the type of and duration of physical therapy which the insurer would cover and did not receive that information; Long specifically requested for nearly two months further information to receive appropriate treatment following the insurer's denial of treatment but the organization did not take any further steps to either assist Long in resolving the controversy or inform him of any rights he might have under the contract or the law. As our discussion below finds, the insurer did not provide an appropriate appeals process for denial of treatment decisions and effectively denied Long the benefits of insurance coverage to which he was entitled. All of these facts are material to the issue of bad faith, preclude entry of summary judgment and require trial unless Long's exclusive remedy was administrative. *See Williams,* 535 N.E.2d at 721.

The Employee Benefit Booklet issued by the State of Wyoming discusses the denial of claims and the utilization review process separately in two different sections. The utilization review section states in relevant part:

### How Does the Health Care Review Service Work?

HCRS is a telephone-based utilization review program, supervised by Physicians and nurses, that helps you receive appropriate care for your condition and control your out-of-pocket costs. This program includes:

● Pre-treatment review of all Hospital stays and surgeries to help protect you from receiving outdated or unnecessary treatment.

● Discharge planning to ensure that Hospital stays are only as long as Medically Necessary and to identify alternatives to extended Hospital stays.

● Identification of patients who might benefit from Great–West's Catastrophic Case Management program.

Your Physician will talk with the medical professionals at HCRS to determine a treatment plan-*before* you receive treatment.

HCRS will determine and authorize:

● The medical necessity of the treatment;

● The appropriate location for the treatment to be provided; and

● If you need to be admitted to a Hospital, the appropriate length of stay.

\* \* \* \*

### How Do I Use HCRS?

\* \* \*

If your Physician and an HCRS review Physician do not concur on a course of treatment, an independent second opinion will be recommended. In such cases, expenses for obtaining a second opinion are payable at 100%, and are not subject to the calendar year deductible. If geographic location or Physician access prohibit you from obtaining a second opinion, the recommendation will be withdrawn and the non-compliance penalty ... will not be applied.

\* \* \* \*

### What Happens If I Don't Use HCRS?

... If your physician does not obtain pre-treatment authorization from HCRS, or you do not follow the HCRS-recommended treatment plan, a 60% non-compliance co-insurance penalty will be applied to your claim. This non-compliance penalty cannot be used to satisfy the calendar year deductible or the breakpoint.

An earlier section of the contract is devoted to payment of benefits and contains the following provisions concerning the denial of claims:

### Notice of Denial of Claim

If any benefits are denied, you will be sent a written notice of the denial. This notice will include:

- Specific reason or reasons for the denial;
- Specific reference to the plan provisions on which the denial is based;
- An explanation of additional material or information needed to complete the claim. You must be given notice of claim denial within 90 days after the claim is filed. If special circumstances require more than 90 days to act on the claim, another 90 days will be allowed....

**Appeal Of A Claim Denial**

If you have any questions about a claim payment, contact the Plan Administrator. If you disagree with the reasons for a claim denial, you can initiate a claim review procedure by giving written notice to the Plan Administrator within 60 days after you receive the written claim denial....

**Decision on Review**

You will be notified of the final decision within 60 days after receipt of a request for review....

**Grievance Procedure**

If you are not satisfied with how a claim has been settled, you may file a grievance with the State Employees' and Officials' Group Insurance Board. Certain steps must be followed:

- You must file a brief statement with the Board explaining the situation. This statement must contain the following information:

    —your name, address, social security number and place of employment;

    —a description of the situation;

    —copies of all pertinent documents, including bills;

    —all information received from the Benefit Payments Office; and

    —the specific response or actions requested from the Board.

■ We agree with Long that the plain language of the contract only contemplates applying the appeals and grievance procedures to a claim for payment and does not contemplate applying the appeals and grievance procedures to HCRS' treatment decisions through the utilization review process. The section outlining the procedure for appealing a denial of a claim is expressly limited to benefit payments and speaks of lengthy time frames which are inappropriate for resolving a dispute over treatment or for appealing a utilization review recommended treatment decision. The section on HCRS decisions plainly states that a failure to follow its recommended treatment will result in the non-compliance penalty and does not provide for an appeals procedure before receiving treatment, causing us to conclude that none is available. Whether or not a contract can be plainly understood to mean one thing is a question of law. *Examination Management Services, Inc. v. Kirschbaum*, 927 P.2d 686, 689 (Wyo.1996). The meaning of a contract that is not ambiguous is controlled by its language. *Id.* The plain meaning of this contract is that Long is not given an appropriate appeal procedure in order to contest HCRS' recommended treatment decision or its later conduct when Long was unable to find a doctor who would administer the steroid injection treatment.

At the same time, the plain meaning of the contract is that Great–West will assist an insured in receiving medically appropriate care and suggests that a dispute between the treating doctor and HCRS will be resolved by a second opinion. In this case, a third opinion did not assist Long in receiving medically appropriate care at the time he was seeking it and, unless the statute prohibits a judicial remedy, we find there are genuine issues of material fact regarding Great–West's handling of Long's request for medical treatment through its utilization review process.

*Wyoming Statute*

Great–West contends that Wyoming statutory law prohibits Long from seeking a judicial remedy and restricts him to the grievance procedure. WYO. STAT. § 9–3–205 (1997) states:

**Administration and management of group insurance program; powers and**

duties; **adoption of rules and regulations.**

(a) The board shall administer and manage the state employees' and officials' group insurance program and, subject to the provisions of this act:

* * * *

(vi) Shall establish a procedure by which the board shall hear complaints by insured employees concerning the allowance and payment of claims, eligibility for coverage and other matters. Unless otherwise provided in the group insurance or supplemental plan or plans, any decision of the board upon complaints is not binding upon either the employee or carrier and the provisions of the Wyoming Administrative Procedure Act shall not apply to the proceedings. The group insurance or supplemental plan or plans may provide that the decision of the board shall be binding upon both the employee and the carrier as to certain disputes and in such event the procedure adopted by the board shall conform to the provisions of the Wyoming Administrative Procedure Act;

The Board promulgated rules and regulations concerning the grievance procedure which state in relevant part:

Section 4. *Exclusivity of Remedy.* These rules provide the exclusive administrative remedy available to state employees and officials, the carrier, and the other aggrieved parties in adjudicating disputes concerning insurance claims and coverage. These rules are intended to and shall be construed to provide adjudication in a manner that is as speedy and inexpensive as is consistent with a full and fair hearing and appropriate deliberation.

Insurance Board of Administration, State Employees' and Officials' Group Health, Rules, Ch. 3, Section 4 (1991).

Long contends that the statutory and rule language does not preclude him from seeking a judicial remedy for contract, civil rights, and tort claims arising from the utilization review process as handled by Great–West.

■ The statute requires the Board to establish a procedure to address an insured's complaints "concerning the allowance and payment of claims, eligibility for coverage and other matters" but leaves it to the Board's discretion as to whether or not the procedure shall be the exclusive remedy. Under its promulgated rule, the Board has established that its grievance procedure to address an insured's dispute concerning "insurance claims and coverage" shall be the exclusive remedy. As we discussed above, the utilization review process involves the insurer's administrator in medical decisions. We consider this kind of involvement in an insured's medical care as beyond the traditional understanding of "insurance claims and coverage." This activity is relatively new to insurance and completely new to this Court. We conclude that the Board has limited the grievance procedure to denial of a claim for payment and has not provided an administrative remedy for denial of treatment decisions during the utilization review process. This conclusion is supported by the fact that the contract does not provide for an appeals process for decisions resulting from the utilization review procedure. The conclusion is also confirmed by the particular facts of this case which indicate that Great–West and the Board did not perceive the grievance procedure as applying until after the claim for payment was denied and by Long's experience when his doctor was not further advised by an HCRS physician once Long was unable to receive the steroid injection treatment. Under these circumstances, Long is permitted to seek a judicial remedy.

## CONCLUSION

We recognize that this area of the law is developing and have chosen to proceed cautiously. Our decision that Long may proceed judicially is based on a recognition that the medical decision made by Great–West must be made in accord with its obligations expressed in the contract and in accord with the duty of good faith. Based on the plain language of the contract, Great–West has agreed to provide appropriate medical care to its insured despite its involvement in cost-conscious medical decision-making through the utilization review process. The grievance procedure contained in the contract does not

apply to the utilization review process; Long may seek a judicial remedy for Great–West's course of conduct. Reversed and remanded for trial.

THOMAS, Justice, dissenting.

Perhaps this case is an example of the axiom of Justice Oliver Wendell Holmes, Jr., that, "Great cases like **hard cases make bad law.**" *Northern Securities Co. v. U.S.*, 193 U.S. 197, 400, 24 S.Ct. 436, 468, 48 L.Ed. 679 (1904) (emphasis added). Certainly the facts as reported by Long, which are reiterated in the majority opinion, invoke sympathy and perhaps call strongly for relief. On the other hand, there may well be enough blame here for everyone to share.

My analysis of the majority opinion, however, causes me to conclude that the Court has indeed reasoned from rather than to a conclusion. The essence of my critical analysis is captured in the statement from the Conclusion of the majority (emphasis added):

> Based on the plain language of the contract, Great–West has agreed to **provide appropriate medical care to its insured** despite its involvement in cost-conscious medical decision-making through the utilization review process.

It may be that there is some language in the statute, the rules and regulations, or the Employee Benefit Booklet that encompasses that agreement, but the majority opinion does not include it, and I cannot find it. Perhaps the statement is necessary to make the opinion congruent with the philosophical discussion of the health care system in the United States.

The majority opinion adopts as legislative facts the ideas of other judges and academics that may or may not be supportable by empirical data. The product of that discussion is that a medical decision has been made by Great West and that a mistaken conclusion about medical necessity deprived Long of necessary medical care. The suggestion is advanced that a medical malpractice action is justified against a plan administrator because of that "medical decision." It is clear, however, from the philosophical discussion that the premise for the assumed harm is that the insured will forego appropriate care because of the advanced advice that the carrier will not pay in full. The logical fallacy presented is that the carrier could be guilty of malpractice in a situation in which a physician could not. It would be fruitless to search for authority that a medical practitioner is guilty of malpractice because his patient decided not to pursue treatment because of the potential expense.

The majority abandons its reliance on federal authority that permits "medical malpractice actions against plan administrators in a limited fashion under various theories such as agency or vicarious liability." Instead, an amorphous theory of a fiduciary relationship is espoused to make Great West a proper defendant. This is followed by a reported perception that "Long's other numerous causes of action [are] in the nature of a claim for bad faith in handling and investigating his claim for appropriate medical treatment." Reliance then is premised on *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855, 860–61(Wyo.1990), the case in which this Court (mistakenly I remain convinced) injected tort remedies into a contractual relationship. The majority then selectively reports a disregard of the plan administrator's duties from Long's pleadings.

One fact that curiously is not included in the majority opinion, probably because it is missing from Long's Complaint, is Long's L4–5 discectomy in February of 1994, approximately one year prior to the onslaught of Long's symptoms in this case. That discectomy was at the identical site for which this surgery was recommended by Long's treating physician. For me, that puts a slightly different spin on the dialogue between Great West, through HCRS, and Long. It is natural to wonder why a patient would need the identical surgery a second time within little more than one year. Presumably, since the case is being remanded for trial that question also will be resolved at that time.

I also wonder whether Long's real problem is that he was caught in the cross-fire between non-network physicians and the plan manager. Is it possible that he was used as a tool to intimidate the plan manager? It

also must be remembered that it was not Long who canceled the surgery because of the refusal of pre-treatment authorization. The treating physician simply advised Long that the surgery had been canceled. One wonders, "What are the liability implications of a unilateral decision by a physician to refuse treatment because of uncertainty about payment?" Specifically, the unilateral action of the treating physician well may be an efficient intervening cause between any medical decision by Great West and harm to Long.

For me, the only correct resolution of this case is to require Long to follow the provisions of the statute, the rules and regulations, and the Employee Benefit Booklet. One of two options should be applied. Either the issue is one of "insurance claims and coverage" under the rules and regulations or it is an issue that should be held for resolution when Long presented a claim for benefits that had been denied. (I note the concession in the majority opinion that full benefits were paid which seems effectively to dispose of Long's breach of contract claim.) We never will know whether the grievance process would have been followed by Great West and the board since Long did not, with respect to the pre-treatment denial of authorization, initiate a proceeding before the board by filing a statement pursuant to the rules and regulations. In an analogous situation involving employment rights, we have said:

> When an employee, like Hermreck, enjoys a remedy pursuant to a collective bargaining agreement, the societal interest can be protected by asserting retaliatory discharge in the grievance process, and we should not permit avoidance of the collective bargaining grievance process by an independent action.

*Hermreck v. United Parcel Service, Inc.,* 938 P.2d 863, 866 (Wyo.1997). Similarly here, the societal interest can be protected by asserting wrongful denial of pre-treatment authorization in the grievance process.

Respectfully, I must dissent from the decision of the majority of the Court in this case. It may be that the majority concluded that the result was necessary to protect societal interests. For me, however, the case is far more simple, involving only a question of whether a party to a health insurance contract is bound to follow the exclusive remedy provided in the contract before turning to the judicial system for relief. The validity of the summary judgment in this instance is quite comparable to the summary judgment upheld in *Bryant v. Pacific Power and Light,* 701 P.2d 1165 (Wyo.1985). The majority opinion offers no refutation to the reliance by Great West upon *Davis v. State,* 910 P.2d 555 (Wyo.1996), and *Glover v. State,* 860 P.2d 1169 (Wyo.1993). It would seem that, at the very least, the district judge is entitled to some explanation as to why the latter case is not even acknowledged in the majority opinion. This is particularly true in view of the approval by implication of the grievance process in *Squillace v. Wyoming State Employees' and Officials' Group Ins. Bd. of Admin.,* 933 P.2d 488 (Wyo.1997).

I simply cannot agree with the holding of the majority that the utilization review process involves the insurer's administrator in medical decisions; "this kind of involvement in an insured's medical care * * * [is] beyond the traditional understanding of 'insurance claims and coverage.'" The issue simply is whether contemplated treatment is covered by the plan. The majority quotes from the statute, Wyo. Stat. § 9–3–205:

> **Administration and management of group insurance program; powers and duties; adoption of rules and regulations.**
>
> (a) The board shall administer and manage the state employees' and officials' group insurance program and, subject to the provisions of this act:
>
> * * *
>
> (vi) Shall establish a procedure by which the board shall hear complaints by insured employees concerning the allowance and payment of claims, eligibility for coverage and other matters. Unless otherwise provided in the group insurance or supplemental plan or plans, any decision of the board upon complaints is not binding upon either the employee or carrier and the provisions of the Wyoming Administrative Procedure Act shall

not apply to the proceedings. The group insurance or supplemental plan or plans may provide that the decision of the board shall be binding upon both the employee and the carrier as to certain disputes and in such event the procedure adopted by the board shall conform to the provisions of the Wyoming Administrative Procedure Act;

\* \* \*

(b) The board shall adopt rules and regulations consistent with the provisions of this act as necessary to carry out its statutory duties and responsibilities.

Then the majority quotes from the Board's promulgated rules and regulations concerning the grievance procedure:

Section 4. *Exclusivity of Remedy.* These rules provide the exclusive administrative remedy available to state employees and officials, the carrier, and the other aggrieved parties in adjudicating disputes concerning insurance claims and coverage. These rules are intended to and shall be construed to provide adjudication in a manner that is as speedy and inexpensive as is consistent with a full and fair hearing and appropriate deliberation.

Long's proposed surgery presented a dispute concerning "insurance \* \* \* coverage," and his remedy pursuant to the Board's rules was exclusive. We should afford the same significance to this contractual provision that we would afford to an agreement for mandatory arbitration. We should not extend *Golden Rule.* The policy choice is whether a state structured plan to provide a benefit to its employees at a reasonable cost is to be burdened by the expenses of litigation such as this or whether disputes should be resolved under the contractual provisions. I submit the latter choice is the reasonable one, and we should require Long to follow the contractual remedy.

I also recognize our rule that if we can uphold summary judgment under the record presented under any proper legal theory, we will do so. *Century Ready–Mix Co. v. Campbell County School Dist.,* 816 P.2d 795, 799 (Wyo.1991), *followed in Peterson v. Sweetwater County School Dist. No. One,* 929 P.2d 525, 529 (Wyo.1996), and *Rissler &*

*McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.,* 929 P.2d 1228, 1232 (Wyo.1996); *Reeves v. Boatman,* 769 P.2d 917, 920 (Wyo.1989). The majority characterizes Long's "other numerous causes of action as being in the nature of a claim for bad faith in handling and investigating his claim for appropriate medical treatment." His Complaint does not contain the factual allegations we required in *State Farm Mut. Auto. Ins. Co. v. Shrader,* 882 P.2d 813, 833–34 (Wyo.1994), a case cited in the majority opinion, where we said:

We hold the scope of available compensatory damages for a breach of the duty of good faith and fair dealing includes damages for harm to pecuniary interests and emotional distress. *Crisci* [*v. Security Ins. Co. of New Haven, Conn.,* 66 Cal.2d 425, 426 P.2d 173, 58 Cal.Rptr. 13 (1967) ], 58 Cal.Rptr. at 19, 426 P.2d at 179. There is a limitation, however, upon the recovery of damages for emotional distress for a breach of this duty. *Gruenberg* [*v. Aetna Ins. Co.,* Cal.3d 566, 108 Cal.Rptr. 480, 510 P.2d 1032], 108 Cal.Rptr. at 489, 510 P.2d at 1041; *Anderson* [*v. Continental Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368 (1978) ], 271 N.W.2d at 378. We agree with the court in *Gruenberg,* that to recover damages for emotional distress, the insured must allege that as a result of the breach of the duty of good faith and fair dealing, the insured has suffered substantial other damages, such as economic loss, in addition to the emotional distress. *Gruenberg,* 108 Cal.Rptr. at 489, 510 P.2d at 1041. *See* Restatement (Second) of Torts, *supra,* at § 905 cmt. c. The economic losses may include loss of earnings, inability to pay creditors, loss of business, costs of litigation brought against the insured as a result of the breach and medical expenses. *Gruenberg,* 108 Cal.Rptr. at 489–90, 510 P.2d at 1041–42. This limitation is imposed to prevent fictitious claims for emotional distress and preserve judicial resources. *Crisci,* 58 Cal.Rptr. at 19, 426 P.2d at 179.

Long has suffered no damages for breach of the contract, and his Complaint fails to allege

the sort of economic losses that our language in *Shrader* requires.

I would affirm the summary judgment entered in favor of the defendants in the district court.