# IN THE SUPREME COURT, STATE OF WYOMING

# 2022 WY 54

APRIL TERM, A.D. 2022

April 20, 2022

JANET G. PETERSON,

Appellant
(Plaintiff),

v.                                                                    S-21-0123

MERITAIN HEALTH, INC.

Appellee
(Defendant).

*Appeal from the District Court of Natrona County*
*The Honorable Catherine E. Wilking, Judge*

***Representing Appellant:***
    Stephen R. Winship, Winship & Winship, P.C., Casper, Wyoming. Argument by Mr. Winship.

***Representing Appellee:***
    Timothy M. Stubson and Holly L. Tysse, Crowley Fleck, PLLP, Casper, Wyoming; Daniel A. Platt and Robert J. Catalano, Loeb & Loeb LLP, Los Angeles, California. Argument by Mr. Platt.

***Before FOX, C.J., and DAVIS\*, KAUTZ, and GRAY, JJ., and RUMPKE†, D.J.***

\* Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.
† Judge Rumpke resigned from judicial office effective March 2, 2022.

**NOTICE:** This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**GRAY, Justice.**

[¶1]    After his claims for health insurance coverage were denied, David Peterson,[1] an insured under Memorial Hospital of Converse County's (Hospital) Health Benefit Plan (Plan), brought this action against the Hospital[2] and Meritain Health, Inc. (Meritain), the third-party administrator of the Plan.  He sought to recover under theories of breach of the Plan contract, breach of the Administrative Services Agreement (ASA) between the Hospital and Meritain, and breach of the covenant of good faith and fair dealing.  After Mr. Peterson filed a third amended complaint, Meritain moved for summary judgment on all claims.

[¶2]    The district court granted summary judgment to Meritain, holding that, lacking privity of contract, Mr. Peterson had no cause of action for breach of contract against a third-party administrator.  Mr. Peterson had no cognizable claim under the ASA as he was not an intended third-party beneficiary as a matter of law.  Without a contract, Mr. Peterson could not assert a cause of action for bad faith against Meritain.  The district court also denied Mr. Peterson's motion for sanctions against Meritain on its discovery conduct and his motion to compel production of Meritain's personnel files.  Mr. Peterson appeals the summary judgment and discovery rulings.  There are genuine issues of material fact regarding Mr. Peterson's breach of contract claim, his third-party beneficiary claim, and his claim for breach of the covenant of good faith and fair dealing.  We reverse in part, affirm in part, and remand for further proceedings.

### ISSUES

[¶3]    The issues are:

      I.     Does New York law apply?

      II.    Is Meritain entitled to summary judgment on Mr. Peterson's claim for breach of the Plan?

            A.     Can plan participants sue third-party administrators for breach of the insurance contract?

---

[1] Mr. Peterson died on March 30, 2018, and Janet G. Peterson, his wife, as the personal representative for his estate, is the remaining plaintiff and appellant in this lawsuit.  We continue to refer to Mr. Peterson throughout this opinion.

[2] Not long after, the Hospital was dismissed.  Nothing in the record reveals the reason for its dismissal.

B.     Does the Plan's use of ERISA language give Mr. Peterson the right to sue Meritain for breach of the Plan?

C.     If Meritain was acting as the Hospital's agent, can Mr. Peterson assert a claim against it for breach of the Plan?

D.     If Meritain was the Hospital's agent and acted without authority, can it be liable to Mr. Peterson under the Plan?

III.    Is Meritain entitled to summary judgment on Mr. Peterson's third-party beneficiary claim for breach of the ASA?

A.     Are there questions of fact as to whether Mr. Peterson was a third-party beneficiary of the ASA?

B.     Did Meritain's and the Hospital's course of conduct modify the terms of the ASA?

IV.    Is Meritain entitled to summary judgment on Mr. Peterson's claim for breach of the covenant of good faith and fair dealing?

A.     Can insurance plan participants sue third-party administrators in bad faith, when there is no contract between the participants and the third-party administrator?

B.     Are there genuine issues of material fact precluding summary judgment on Mr. Peterson's claim for breach of the covenant of good faith and fair dealing?

V.     Can Mr. Peterson recover punitive damages or attorney fees?

VI.    Did the district court abuse its discretion when it did not impose sanctions for Meritain's conduct during

discovery or when it denied Mr. Peterson's request for personnel files?

## *FACTS*

### The Hospital's Health Benefit Plan

[¶4]　The Hospital provided a self-funded health insurance plan for its employees.  The Plan was drafted by Meritain, and Meritain's name appears on its cover.

[¶5]　The Plan was established "for [the] benefit [of the Hospital's employees and dependents]."  It defines the Hospital as the "Plan Administrator" and the "Plan Sponsor."  It identifies Meritain as the "Third Party Administrator."  It states that the Hospital "is a named fiduciary of the Plan with full discretionary authority for the control and management of the operation and administration of the Plan."  Finally, the Plan states that it "is administered by" the Hospital and the Hospital "has retained the services of the Third Party Administrator [Meritain] to provide certain claims processing and other ministerial services."

### The Administrative Services Agreement

[¶6]　Meritain contracted to administer the Plan pursuant to an Administrative Services Agreement (ASA) between Meritain and the Hospital.  The ASA was drafted by Meritain and states that "Meritain shall have no discretionary authority to interpret the Plan or to adjudicate Claims."　The ASA requires Meritain to "[r]efer to [the Hospital], for its exclusive and final resolution, any questions concerning the meaning of any part of [the Plan]" and "the validity of questionable or disputed Claims."  It also requires Meritain to "[r]efer to [the Hospital], for its exclusive and final resolution, any appeals from any denial of any of the Claims."

### Mr. Peterson and His Claims for Insurance Coverage

[¶7]　Mr. Peterson began working for the Hospital in February 2013 and became insured under the Plan on August 1, 2013.  In 2012, prior to his employment with the Hospital, Mr. Peterson had been prescribed medication for "probable viral myocarditis,"[3] and he received two coronary artery stents to treat blockages in his artery.  In October 2013, Mr. Peterson was diagnosed with congestive heart failure and cardiomyopathy.  In November 2013, Mr.

---

[3] "Myocarditis is an inflammation of the heart muscle" which can "reduce the heart's ability to pump and cause rapid or irregular heart rhythms (arrhythmias)."　Mayo Clinic, *Myocarditis*, https://www.mayoclinic.org/diseases-conditions/myocarditis/symptoms-causes/syc-20352539 (last visited Apr. 8, 2022).

Peterson was hospitalized and received treatment, including an implanted defibrillator. Mr. Peterson incurred $247,934.74 in medical bills.

[¶8] Mr. Peterson submitted his medical bills to Meritain. Meritain paid some of the bills but denied coverage for $207,423.67 determining these charges related to a pre-existing condition, which the Plan excludes from coverage. Mr. Peterson appealed Meritain's decision. Meritain reviewed and denied his appeal. The Plan allowed a second appeal, which Mr. Peterson pursued. Meritain reviewed and denied his second appeal. The Hospital was not involved in any of his claims or appeals.

**This Lawsuit**

[¶9] On March 13, 2017, Mr. Peterson sued the Hospital and Meritain.[4] Not long after the suit was filed, the Hospital was dismissed. On September 17, 2020, after a series of trial continuances, discovery disputes, and deadline extensions, Mr. Peterson filed a Third Amended Complaint, alleging breach of the Plan contract, breach of the ASA contract as a third-party beneficiary, breach of the implied covenant of good faith and fair dealing, and seeking punitive damages and attorney fees. Mr. Peterson contends that his claims should have been covered by the Plan. He asserts that Meritain, when it administered his claims, stepped into the shoes of the Hospital and improperly denied coverage, thereby breaching the Plan and the ASA. He also contends that the way Meritain investigated and denied his claims constituted bad faith.

**Facts in Dispute**

[¶10] Meritain filed a motion for summary judgment arguing that because the Plan was an agreement between the Hospital and Mr. Peterson, Mr. Peterson had no privity with Meritain and could not sue for breach of the Plan; Mr. Peterson as a nonparty could not sue for breach of the ASA; Mr. Peterson was not a third-party beneficiary of the ASA; Mr. Peterson could not assert a bad faith claim absent a contract with Meritain; and Meritain could not have acted in bad faith because it had only ministerial functions under the Plan and ASA. In opposition to Meritain's motion for summary judgment, Mr. Peterson's expert, James M. Deren, attested that, as a third-party administrator, and contrary to the terms of the ASA, "Meritain exercised discretionary control in the manner in which it administered Mr. Peterson's claims and appeals." He also testified that Meritain did not obtain Mr. Peterson's past medical records to determine whether his prior medication and treatment were in fact pre-existing conditions. He said,

> [b]ecause Mr. Peterson was taking Carvedilol in the six
> months prior [to his enrollment in the Plan], Meritain assumed

---

[4] On October 3, 2016, a collection agency sued Mr. and Mrs. Peterson to recover $188,328.85 for the defibrillator surgery.

4

that he was being "treated" for congestive heart failure and cardiomyopathy. Mr. Peterson's medical records . . . indicate that in early 2012, Mr. Peterson was diagnosed . . . as having "probable viral myocarditis" . . . . This condition was successfully treated by the placement of cardiac stents. Mr. Peterson also had a history of hypertension. A claim should not be denied based on speculation or insufficient information.

[¶11] He opined that Meritain did not follow industry guidelines, and, if it had, it would have conducted a more thorough investigation and would have concluded that Mr. Peterson's claims were covered by the Plan.[5]

[¶12] He explained that Meritain's internal policies "instruct[] the claim[] examiner to not review any further records" if "there is any indication of a pre-existing condition." In his opinion, this "policy defeat[ed] a full and fair review of a claim." He asserted that Meritain did not request "additional information to fully complete or perfect the claim" and it did not "indicate[] the specific medical treatment that gave rise to the determination that it was a pre-existing condition . . . ." Mr. Deren concluded, "It was improper to deny the claims as pre-existing because . . . a full investigation of the claims . . . would have disclosed that Mr. Peterson had not been previously treated for congestive heart failure or cardiomyopathy." Further, it was his conclusion that Meritain determined Mr. Peterson's claims in an untimely manner. He also explained that "Meritain approved payment of many of Mr. Peterson's claims that were related to the claims that it denied. . . . In other words, Meritain was inconsistent in its application of the pre-existing condition exclusion." Finally, he pointed out that "[e]ven though the ASA [states that the Hospital] is to decide the appeals, there is nothing in the records [he] reviewed to indicate that [the Hospital] was even aware of Mr. Peterson's appeal much less having decided it. Mr. Peterson's second level appeal was never decided on its merits."

**The District Court's Decision**

---

[5] The Plan provides that "[t]he length of the Pre-Existing Condition Limitation may be reduced or eliminated if a Covered Person has Creditable Coverage, provided there was not a Significant Break in Coverage." Mr. Deren explained, the third-party administration "industry follows the International Claim Association's guidelines, which . . . state[] that '[e]very claimant is entitled to a *prompt* investigation of *all pertinent facts*, and the equitable settlement of his claim as soon as liability has come reasonably clear.'"

> An investigation following these guidelines would have included an investigation of Mr. Peterson's insurance coverage prior to becoming a Plan Member [and] would have disclosed that Mr. Peterson had "Creditable Coverage" for . . . times relevant to this matter such that the claims in question were not subject to the Plan's exclusion for pre-existing conditions[.]

Mr. Deren explained: Mr. Peterson's age of 66 years "alone should have triggered an inquiry by the Meritain claim examiner as to any possibility of other or prior insurance . . . coverage for Mr. Peterson." "Meritain did little to nothing to investigate whether Mr. Peterson had creditable coverage."

5

[¶13]   The district court granted Meritain's motion for summary judgment, concluding that Mr. Peterson could not assert a breach of contract claim against Meritain because it was not a party to the Plan, that Mr. Peterson was not an intended third-party beneficiary of the ASA, and that because he had no contractual claims, he could not assert a claim for bad faith.  Mr. Peterson appeals.

## STANDARD OF REVIEW

### A.    Summary Judgment

[¶14]   A grant of summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  W.R.C.P. 56(a).

[¶15]   This Court reviews a district court's order granting summary judgment de novo and may affirm on any basis in the record.  *Bergantino v. State Farm Mut. Auto. Ins. Co.*, 2021 WY 138, ¶ 7, 500 P.3d 249, 253 (Wyo. 2021) (citing *Gowdy v. Cook*, 2020 WY 3, ¶ 21, 455 P.3d 1201, 1206–07 (Wyo. 2020) (citing *Bear Peak Res., LLC v. Peak Powder River Res., LLC*, 2017 WY 124, ¶ 10, 403 P.3d 1033, 1040 (Wyo. 2017)); *King v. Cowboy Dodge, Inc.*, 2015 WY 129, ¶ 16, 357 P.3d 755, 759 (Wyo. 2015)).

> [W]e review a summary judgment in the same light as the district court, using the same materials and following the same standards.  We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record.  A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties.

*Sullivan v. Pike & Susan Sullivan Found.*, 2018 WY 19, ¶ 15, 412 P.3d 306, 310 (Wyo. 2018) (internal citations omitted) (quoting *Rogers v. Wright*, 2016 WY 10, ¶ 7, 366 P.3d 1264, 1269 (Wyo. 2016)).

[¶16]   The movant "'bears the initial burden of establishing a prima facie case for summary judgment' using admissible evidence."  *Bergantino*, ¶ 8, 500 P.3d at 253 (quoting *Gowdy*, ¶ 22, 455 P.3d at 1207).  "If the movant establishes a prima facie case for summary judgment, the burden shifts to the opposing party to present admissible evidence demonstrating a genuine dispute of material fact for trial."  *Id.* (citing *Gowdy*, ¶ 23, 455 P.3d at 1207).  *See also* W.R.C.P. 56(c) (requiring evidence supporting and opposing summary judgment to be admissible).

**B. Discovery Rulings**

[¶17] District courts are "generally afforded broad discretion, both in the mechanisms adopted to control discovery and in its selection of appropriate sanctions for violations of discovery." *Black Diamond Energy, Inc. v. Encana Oil & Gas (USA) Inc.*, 2014 WY 64, ¶ 43, 326 P.3d 904, 915 (Wyo. 2014) (citing *Roemmich v. Roemmich*, 2010 WY 115, ¶ 22, 238 P.3d 89, 95 (Wyo. 2010)); *see also Windham v. Windham*, 2015 WY 61, ¶ 16, 348 P.3d 836, 841 (Wyo. 2015). This Court reviews a district court's rulings on discovery, including the issuance of sanctions, for an abuse of discretion. *Herrick v. Jackson Hole Airport Bd.*, 2019 WY 118, ¶ 11, 452 P.3d 1276, 1280 (Wyo. 2019). "The appellant carries the burden of proof to demonstrate an abuse of discretion, and the ultimate issue is whether the court could have reasonably concluded as it did." *Groskop as Tr. of Black Diamond Liquidating Litig. Tr. v. S&T Bank*, 2020 WY 113, ¶ 25, 471 P.3d 274, 282 (Wyo. 2020). "As long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal." *Rammell v. Mountainaire Animal Clinic, P.C.*, 2019 WY 53, ¶ 29, 442 P.3d 41, 49 (Wyo. 2019) (quoting *Downs v. Homax Oil Sales, Inc.*, 2018 WY 71, ¶ 19, 421 P.3d 518, 523 (Wyo. 2018)).

[¶18] When a district court imposes sanctions following discovery violations, "[w]e apply a *de novo* standard of review to the question whether the district court correctly interpreted W.R.C.P. 37." *Windham*, ¶ 12, 348 P.3d at 840 (citing *Harmon v. Star Valley Med. Ctr.*, 2014 WY 90, ¶ 17, 331 P.3d 1174, 1178 (Wyo. 2014)). We review a district court's factual determinations for clear error. *Davis v. Harmony Dev., LLC*, 2020 WY 39, ¶ 18, 460 P.3d 230, 237 (Wyo. 2020); *Sharpe v. Timchula, Tr. of the Judith Timchula Living Tr. dated Oct. 19, 2000*, 2019 WY 121, ¶ 19, 453 P.3d 761, 766 (Wyo. 2019); *Groskop*, ¶ 26, 471 P.3d at 282.

## *DISCUSSION*

### I. *Does New York law apply?*

[¶19] Meritain raises the application of New York law for the first time on appeal. Meritain asserts that the ASA provides, it "shall be construed and enforced in accordance with the laws of the State of New York, to the extent such laws are not preempted by ERISA." Generally, this Court will "enforce a contract's choice-of-law provision and apply foreign law when doing so is not contrary to the law, public policy, or the general interests of Wyoming's citizens." *Denbury Onshore, LLC v. APMTG Helium LLC*, 2020 WY 146, ¶ 24, 476 P.3d 1098, 1105 (Wyo. 2020) (citations and internal quotation marks omitted) (applying New York law when interpreting the contract but applying Wyoming law to procedural matters).

[¶20]   At the same time, we "adhere to '[o]ur general rule . . . that we will not consider issues not raised in the court below.'" *Williams v. Tharp*, 2017 WY 8, ¶ 10, 388 P.3d 513, 517 (Wyo. 2017) (quoting *Rock Springs Land & Timber, Inc. v. Lore*, 2003 WY 100, ¶ 35, 75 P.3d 614, 627 (Wyo. 2003)).   An exception to this rule is when the issues raised "are jurisdictional or are fundamental in nature." *Amoco Prod. Co. v. Dep't of Revenue, State of Wyo.*, 2004 WY 89, ¶ 53, 94 P.3d 430, 449 (Wyo. 2004) (quoting *Yates v. Yates*, 2003 WY 161, ¶ 13, 81 P.3d 184, 188 (Wyo. 2003)).   Choice of law questions are neither jurisdictional nor fundamental.   Meritain waived this argument by failing to raise it below.   Wyoming law applies.

## II.     Is Meritain entitled to summary judgment on Mr. Peterson's claim for breach of the Plan?

## A.     Can plan participants sue third-party administrators for breach of the insurance contract?

[¶21]   Meritain argued below that it cannot be liable for breach of contract because it is not a party to Mr. Peterson's insurance contract with the Hospital.   The district court agreed, holding that "an essential element of a breach of contract claim is the existence of a lawfully enforceable contract," and because "there is no lawfully enforceable contract between Meritain and [Mr.] Peterson," it granted summary judgment for Meritain on Mr. Peterson's breach of contract claim.

[¶22]   The elements of a breach of contract claim are "a lawfully enforceable contract, an unjustified failure to timely perform all or any part of what is promised . . . , and entitlement of [the] injured party to damages." *Halling v. Yovanovich*, 2017 WY 28, ¶ 13, 391 P.3d 611, 616–17 (Wyo. 2017) (quoting *Schlinger v. McGhee*, 2012 WY 7, ¶ 12, 268 P.3d 264, 268 (Wyo. 2012), *as amended on reh'g* (Feb. 7, 2012)); *see also Mantle v. N. Star Energy & Constr. LLC*, 2019 WY 29, ¶ 69, 437 P.3d 758, 784 (Wyo. 2019) ("elements of a contract are offer, acceptance and consideration" (quoting *McLean v. Hyland Enterprises, Inc.*, 2001 WY 111, ¶ 42, 34 P.3d 1262, 1272 (Wyo. 2001))).   It is well-settled that a non-party to a contract cannot be sued for breach of that contract. *See Rogers*, ¶ 30, 366 P.3d at 1275 (contract law "is designed to protect expectations bargained for in a contract"); *Cent. Contractors Co. v. Paradise Valley Util. Co.*, 634 P.2d 346, 348 (Wyo. 1981) ("privity of contract is an essential element [for] a cause of action on a contract"); *Larsen v. Sjogren*, 67 Wyo. 447, 472, 226 P.2d 177, 186 (1951) ("[t]he parties to a contract are the ones to complain of a breach") (quoting *Williams v. Eggleston*, 170 U.S. 304, 309, 18 S.Ct. 617, 619, 42 L.Ed. 1047 (1898)).

[¶23]   The Plan was a contract between the Hospital and its employees, in this case, Mr. Peterson.   The Plan states that the Hospital, the "Plan Sponsor":

8

> [H]as adopted this amended and restated Plan Document and Summary Plan Description effective as of August 1, 2011, for the Memorial Hospital of Converse County Health Benefit Plan (hereinafter referred to as the "Plan" or "Summary Plan Description"), as set forth herein for the exclusive benefit of its Employees and their eligible Dependents.

While our inquiry does not stop here, under this general rule, Meritain, a nonparty to the Plan, could not be sued for an alleged breach of the Plan.

**B.     Does the Plan's use of ERISA language give Mr. Peterson the right to sue Meritain for breach of the Plan?**

[¶24] Mr. Peterson argues that the Plan incorporated the Employee Retirement Income Security Act of 1974 (ERISA), and under ERISA, an insured (Mr. Peterson) can sue a third-party administrator (Meritain) for breach of contract.[6]

### 1. ERISA

[¶25] ERISA allows claims against third-party administrators acting as fiduciaries. 29 U.S.C. § 1109(a). A third-party administrator will be considered a fiduciary under ERISA if it "uses its own discretion in allowing and denying claims and does not follow any procedures or guidelines established by another party . . . regardless of [terms describing] the third-party administrator's status under the administration agreement." Paul J. Routh, *Welfare Benefits Guide, Definition of fiduciary* § 5:3 (Jan. 2022 Update). 29 U.S.C. § 1110(a) ("any provision in an agreement . . . which purports to relieve a fiduciary from responsibility or liability . . . shall be void against public policy").

[¶26] ERISA provides that it "shall not apply to any employee benefit plan if . . . such plan is a governmental plan." 29 U.S.C. § 1003(b)(1). A "governmental plan" is a "plan established or maintained for its employees . . . by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(32). Courts have held that a governmental employer cannot "opt in" to ERISA. *See, e.g., Hall v. Maine Mun. Emps. Health Tr.*, 93 F. Supp. 2d 73, 75 (D. Me.

---

[6] There is no dispute that the Plan and the ASA contain language referring to ERISA and incorporating ERISA definitions. For example, the ASA states that the Plan was to be operated and maintained according to ERISA. ERISA is a defined term in the ASA. Both the Plan and the ASA utilize ERISA terminology such as "discretionary authority." (Under ERISA, a third-party administrator with "discretionary authority" is deemed a "fiduciary." 29 U.S.C. § 1002(21)(A)(iii)). The Plan provides that its "claim procedures are intended to reflect the Department of Labor's claims procedures [and] regulations, and should be interpreted accordingly." *See infra* ¶ 29.

2000); *Michel v. United Healthcare of Louisiana, Inc.*, No. CIV.A. 03-0649, 2003 WL 1790846 (E.D. La. Apr. 2, 2003).

## 2. Application of ERISA Here

[¶27] The district court found that ERISA does not apply because the Hospital is a government entity, and the Plan is a governmental plan. There is no dispute the Plan is a governmental plan, and the Hospital could not opt into ERISA. ERISA does not confer upon Mr. Peterson the right to sue Meritain. But it is well established in Wyoming that "parties to a contract are free to incorporate within their agreement whatever lawful terms they desire." *City of Gillette v. Hladky Const., Inc.*, 2008 WY 134, ¶ 46, 196 P.3d 184, 200 (Wyo. 2008).

[¶28] While the Hospital could not opt into ERISA, the parties were free to include ERISA terms and conditions in their contract.

> An insurance policy constitutes a contract between the insurer and the insured. As with other types of contracts, our basic purpose in construing or interpreting an insurance contract is to determine the parties' true intent. We must determine intent, if possible, from the language used in the policy, viewing it in light of what the parties must reasonably have intended. The nature of our inquiry depends upon how clearly the parties have memorialized their intent. Where the contract is clear and unambiguous, our inquiry is limited to the four corners of the document.
>
> We interpret an unambiguous contract in accordance with the ordinary and usual meaning of its terms. The parties to an insurance contract are free to incorporate within the policy whatever lawful terms they desire, and the courts are not at liberty, under the guise of judicial construction, to rewrite the policy. It is only when a contract is ambiguous that we construe the document by resorting to rules of construction. Whether a contract is ambiguous is a question for the court to decide as a matter of law.

*Bergantino*, ¶ 9, 500 P.3d at 253 (quoting *Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 18, 123 P.3d 579, 587–88 (Wyo. 2005)). To the extent ERISA terms and conditions were incorporated into the Plan, the parties' intent to be governed by those provisions will not be read out of the agreement. *See Arnold v. Mountain W. Farm Bureau Mut. Ins. Co.*, 707 P.2d 161, 166 (Wyo. 1985) ("We are not free to rewrite contracts under the guise of interpretation."); *Pope v. Rosenberg*, 2015 WY 142, ¶ 20, 361 P.3d 824, 830

(Wyo. 2015) ("we avoid interpreting a contract . . . so as to render any provision meaningless" (quoting *Wallop Canyon Ranch, LLC v. Goodwyn*, 2015 WY 81, ¶ 35, 351 P.3d 943, 953 (Wyo. 2015))).

[¶29]  The Plan, referring to ERISA, states, its "claim procedures are intended to reflect the Department of Labor's claims procedures [and] regulations, and should be interpreted accordingly."  The Plan also uses ERISA language, stating that the Plan Administrator (Hospital) "will have maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding [benefit eligibility], to decide disputes . . . , and to decide questions of Plan interpretation[.]"  It states the Plan Administrator (Hospital) has "discretion" to perform certain tasks such as paying different entities, deciding whether and from whom to recover excess payments, and denying future benefits if excess payments are not recovered.  The Plan also provides that the "Plan Administrator [Hospital] retains sole, full and final discretionary authority to construe and interpret" subrogation rights "to determine all questions of fact and law" arising with respect to those rights.  It also states, "to the extent this Plan is not governed by ERISA, the Plan's right to subrogation and reimbursement may be subject to applicable State subrogation laws."  In the definitions section, the Plan defines ERISA.

[¶30] While the Plan states that its "claims procedures" should be interpreted in accordance with ERISA and contains references and terminology used in ERISA, the Plan does not adopt ERISA provisions that allow plan participants to sue third-party administrators in general, or Meritain, specifically.  It does not adopt 29 U.S.C. § 1109(a), the ERISA provision that allows claims against third-party administrators acting as fiduciaries.  The Plan's general references to ERISA are insufficient to provide an ERISA cause of action against Meritain for breach of the Plan.

C.     If Meritain was acting as the Hospital's agent, can Mr. Peterson assert a claim against it for breach of the Plan?

[¶31]  Mr. Peterson argues whether Meritain acted as an independent contractor or the Hospital's agent are questions of fact, and if Meritain acted in either of these capacities, it assumed liability for its actions.  Meritain does not address this argument, except as it relates to Mr. Peterson's claim for breach of the covenant of good faith and fair dealing.[7] Meritain contends that its status as an agent or independent contractor has no relevance to Mr. Peterson's claims for breach of contract.  After a careful reading of Mr. Peterson's brief, we agree with Meritain's interpretation of Mr. Peterson's argument as to Meritain's

---

[7] In that context, Meritain contends in a footnote:

> Plaintiff does not appear to contend that Meritain's status as an agent or independent contractor has any relevance to the claims against it for breach of contract (Counts I and II), nor can Plaintiff make such an argument. A claim for breach of contract is asserted against the party to the contract, not its agents or independent contractors.

11

status as an independent contractor but conclude that Meritain misconstrued Mr. Peterson's argument as to its agency status. Mr. Peterson claims that Meritain's status as an agent is a separate ground for contractual liability. We address the agency argument here and consider the independent contractor argument in our analysis of a duty of good faith and fair dealing as it applies to third-party administrators.

## 1. Agency

[¶32] Mr. Peterson can assert a claim for breach of the Plan against Meritain if Meritain was acting as the Hospital's agent, and if Meritain acted beyond its scope of authority. If, on the other hand, Meritain was not acting as the Hospital's agent, or if Meritain acted within its agency authority, Mr. Peterson's claim for breach of the Plan lies against the Hospital, not Meritain.

[¶33] A principal-agent relationship "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent." *Austin v. Kaness*, 950 P.2d 561, 564 (Wyo. 1997) (quoting *Holliday v. Bannister*, 741 P.2d 89, 95 (Wyo. 1987)).[8] "Whether an agency relationship exists and the scope of the agent's authority are questions of fact." *Hamilton v. Natrona Cnty. Educ. Ass'n*, 901 P.2d 381, 386 (Wyo. 1995) (quoting *Cargill, Inc. v. Mountain Cement Co.*, 891 P.2d 57, 62 (Wyo. 1995)). However, when evidence is not presented creating a question of fact, the determinations can be made as a matter of law. *Id.*

---

[8] "The overriding consideration in distinguishing between [agency] relationships and employer-independent contractor relationships is the employer's right to control the means and manner of the work." *Singer v. New Tech Eng'g L.P.*, 2010 WY 31, ¶ 9, 227 P.3d 305, 309 (Wyo. 2010) (quoting *Kruckenberg v. Ding Masters, Inc.*, 2008 WY 40, ¶ 21, 180 P.3d 895, 901–02 (Wyo. 2008) (citing *Stratman v. Admiral Beverage Corp.*, 760 P.2d 974, 980 (Wyo. 1988); *Cline v. State, Dep't of Family Servs.*, 927 P.2d 261, 263 (Wyo. 1996); *Noonan v. Texaco, Inc.*, 713 P.2d 160, 164 (Wyo. 1986))).

> Such a right to control is a prerequisite of the master-servant relationship. Conversely, the absence of such a right of control is a prerequisite of an independent contractor relationship. Master-servant and independent contractor are thus opposite sides of the same coin; one cannot be both at the same time with respect to the same activity; the one necessarily negatives the other, each depending on opposite answers to the same right of control inquiry.

*Coates v. Anderson*, 2004 WY 11, ¶ 7, 84 P.3d 953, 957 (Wyo. 2004). When a worker is an independent contractor, the employer is typically interested only in the results of the work and does not direct the details of . . . how the work is performed. *Noonan*, 713 P.2d at 166; *Natural Gas Processing Co. v. Hull*, 886 P.2d 1181, 1186 (Wyo. 1994).

> When an express contract exists between the parties, it is important evidence in defining the relationship, although it is not conclusive of the issue. *Coates*, ¶ 14; *Noonan*, 713 P.2d at 164.

*Singer*, ¶ 9, 227 P.3d at 309 (quoting *Kruckenberg*, ¶ 21, 180 P.3d at 901–02).

[¶34] Mr. Peterson has presented evidence of an agency relationship between Meritain and the Hospital. This evidence includes Meritain's name on the cover of the Plan and Meritain's assumption of all claims functions, including processing, investigation, approval, denial, consideration of appeals, payment, and final decisions. He also presents evidence of the Hospital's complete absence from the claims process.

[¶35] There are questions of fact as to whether Meritain acted as the Hospital's agent when it decided Mr. Peterson's claims and appeals.

## 2. Implication of Agency Status

[¶36] Assuming Meritain did act as the Hospital's agent when it decided Mr. Peterson's claims and appeals, such conduct would not generally give rise to a claim against Meritain. When an agent breaches a contract between a third party and a principal, the third party may recover against the principal, not the agent. *See* Restatement (Third) of Agency § 6.01 (Am. L. Inst. 2006).

[¶37] An agent for a disclosed principal does not become a party to the contract because of their agent status. Restatement (Second) of Agency § 320 (Am. L. Inst. 1958) ("Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract."); Restatement (Third) of Agency § 6.01 ("When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, (1) the principal and the third party are parties to the contract; and (2) the agent is not a party to the contract unless the agent and third party agree otherwise.").

[¶38] In *Excel Constr., Inc. v. HKM Eng'g, Inc.*, Excel Construction (Excel) contracted with the Town of Lovell to replace and improve water and sewer lines. HKM Engineering (HKM) contracted with the town to act as the project engineer for the project. *Excel Constr., Inc. v. HKM Eng'g, Inc.*, 2010 WY 34, ¶¶ 3–4, 228 P.3d 40, 42–43 (Wyo. 2010). Disputes arose between HKM and Excel as to HKM's approval of change orders, HKM's certification of the work, and other issues. Excel sued the town and subsequently joined HKM as a defendant. *Id.* ¶¶ 8–9, 228 P.3d at 43–44. We held that the proper remedy for an agent's breach is a suit against the principal:

> HKM was charged with determining compliance with the contract, approving change orders, and otherwise serving as decision-maker for the Town of Lovell by the express terms of its agreement. HKM therefore acted not only as an agent, but as an agent with the power to make decisions on behalf of the town. Its actions, if they breached the contract, may entitle

13

Excel to recover against the town for that breach, but Excel may not recover from HKM . . . .

*Id.* ¶ 23, 228 P.3d at 47.

[¶39]   If Meritain was the Hospital's agent, *so long as Meritain was acting with authority*, Mr. Peterson's cause of action is against the Hospital, not Meritain.  We must then address the flip side of this question which is, if Meritain was an agent acting without authority, can it be liable in contract?

**D.     If Meritain was the Hospital's agent and acted without authority, can it be liable to Mr. Peterson under the Plan?**

[¶40]   Mr. Peterson contends that if Meritain undertook discretionary duties beyond those provided for in the Plan and the ASA, he can assert his breach of contract claim against Meritain under the Plan.

[¶41]   When an agent is acting without authority on behalf of a disclosed principal, it can be held liable for its conduct in some circumstances.  *See, e.g.*, *Brown v. Grady*, 16 Wyo. 151, 92 P. 622, 624 (1907) ("the agent clearly exceeded his authority in executing [the contract and] not having been ratified by [the principal, the principal] was not bound thereby"); *Wilson v. Rogers*, 1 Wyo. 51, 56 (1872) ("if an agent transcends his agency, or departs from its provisions, or conducts himself so as to render his principal inaccessible or irresponsible, or if he acts in bad faith, he makes himself personally liable"); *see also Nero v. LA Indep. Ins. Agencies, Inc., Unitrin Specialty Lines Ins.*, No. Civ.A. 02-3317, 2003 WL 203145, at *2 (E.D. La. Jan. 29, 2003) ("an agent for a known principal cannot be held personally liable for breach of contract unless the agent personally binds itself or exceeds its authority").

> The general rule that only the principal has rights and liabilities under the contract is subject to several exceptions. Most importantly, the agent's freedom from liability on the contract is normally conditioned on disclosure to the party contracting with the agent of the fact of the agency and the identity of the principal, and **an agent who acts in excess of its authority is generally liable on the contract.**  Also, an agent may expressly assume obligations under the contract . . . .

12 Samuel Williston, *Treatise on the Law of Contracts* § 35:34, at 503–04 (Richard A. Lord ed., 4th ed. 2012) (emphasis added) (footnotes omitted); *see Snyder v. Lovercheck*, 992 P.2d 1079, 1089 (Wyo. 1999); *see also Halliday v. Great Lakes Ins. SE*, No. 3:18-CV-00072, 2019 WL 3500913, at *15 (D.V.I. Aug. 1, 2019) ("an agent may be personally

liable in contract when he . . . *exceeds the scope of his authority*" (quoting *Francis v. Miller*, 26 V.I. 184, 186 (Terr. V.I. Sept. 6, 1991))); Restatement (Second) of Agency § 322 cmt. b; *United States v. Webber*, 396 F.2d 381, 389 n.18 (3d Cir. 1968).[9]

[¶42]   The court in *Halliday* held that an insurance adjuster (and agent of the insurer) "may be personally liable in contract when he acts on behalf of an undisclosed principal or **exceeds the scope of his authority**."   *Halliday*, 2019 WL 3500913, at *15 (emphasis added) (quoting *Francis*, 26 V.I. at 186).   In *Halliday*, the plaintiff had insured his boat with Great Lakes Insurance SE (Great Lakes).   *Id.* at *2.   The boat was damaged by Hurricane Irma.   *Id.*   Great Lakes engaged Wager & Associates, Inc. (Wager), a Florida corporation "engaged in the business of Yacht Surveying, Insurance Claim Adjusting, and Insurance Claim Management," to adjust the plaintiff's claim for damage on the vessel.   *Id.* at *1–2.   The plaintiff provided Davis Marine Surveying and Adjusting's (Davis) repair estimate of $320,000 to $350,000 to repair the boat.   Davis was the original estimator of the boat's value for insurance coverage.   Great Lakes established the premiums based on that estimate.   *Id.* at *2.   Wager informed Great Lakes that the "Plaintiff falsely claimed that . . . the vessel had been damaged by the storm when in fact the damage was the result of poor maintenance" and that "in its view, Davis' [original] survey . . . 'was misleading and contained false information . . . ' because Wager's research indicated that the vessel's selling prices were far below the [Davis' original value] estimates."   *Id.*   When it became apparent that Great Lakes would not cover his costs to repair the vessel, the plaintiff sued Great Lakes, Wager, and the underwriter for his insurance policy.   *Id.* at *1.

[¶43]   The plaintiff asserted a claim of gross negligence against Wager and alleged that the plaintiff was a third-party beneficiary of the adjustment of the claim contract between Great

---

[9] Most commonly, this rule has been applied when an agent purports to enter a contract on behalf of a principal, not when the agent's acts breach a contract between the principal and a third party. *See, e.g.*, *Brown*, 92 P. at 624; *see also Hauff v. Petterson*, 755 F. Supp. 2d 1138, 1150 (D.N.M. 2010) ("[I]t is well established that an agent acting within his authority for a disclosed principal is not personally liable unless he was expressly made a party to the contract or unless he conducts himself in such a manner as to indicate an intent to be bound." (quoting *Barnes v. Sadler Assocs., Inc.*, 1981-NMSC-004, ¶ 5, 622 P.2d 239, 240)); *Precision Mech., Inc. v. Empyrean Hosp.*, No. CV075002281, 2007 WL 3011010, at *3 (Conn. Super. Ct. Sept. 26, 2007) ("A person who purports to make a contract . . . with a third party on behalf of another person, lacking power to bind that person, gives an implied warranty of authority to the third party and is subject to liability to the third party for damages caused by breach of that warranty." (quoting Restatement (Third) of Agency § 6.10 (2006))); *Cytacki v. AP Parts Mfg. Co.*, 74 F.3d 1240, at *4 (6th Cir. 1996) ("Michigan law holds that where an agent executes a contract on behalf of his principal, he may not be held personally liable on the contract unless he acts outside the scope of his authority."); *Tapper v. Lumbermens Mut. Cas. Co.*, 662 F. Supp. 599, 602 n.4 (S.D. Miss. 1987) ("[A]lthough an insurance agent acting on behalf of a disclosed carrier principal in procuring insurance policies for a client does not become a party to the insurance contract and thus may not be held liable for damages caused by breach of the contract by the insurer, *Patton v. Aetna Ins. Co.*, 595 F. Supp. 533 (N.D. Miss. 1984), certain actions or omissions attributable to the agent while having undertaken to procure a client's requested coverage may subject the agent to tortious and, in some instances, contractual liability. *Southside, Inc. v. Clark*, 460 So. 2d 113 (Miss. 1984).").

Lakes and Wager. *Id.* at \*2. The district court held that "insurance claimants have a common law cause of action against insurance adjusters for gross negligence but are categorically barred from bringing claims against adjusters for ordinary negligence." *Id.* at \*9. The court reasoned:

> "[J]urisprudence should not be in the position of approving a deliberate wrong," *Bass* [*v. California Life Ins. Co.*], 581 So. 2d [1087,] 1090 [(Miss. 1991)], and a claimant should have recourse against an adjuster who operates in a manner that undermines the integrity of an insurance claim adjustment or sabotages what otherwise might be a legitimate claim. Indeed, the type of conduct that could constitute gross negligence on the part of the adjuster might not even create liability for the insurance company. An adjuster should not be able to cloak itself as an agent of the insurer for such behavior. To do so could potentially erode the public's faith in the private insurance process.

*Halliday*, 2019 WL 3500913, at \*12.

[¶44] The court also concluded that the plaintiff could assert a third-party beneficiary claim against Wager. *Id.* at \*15. It explained that "an agent may be personally liable in contract when he acts on behalf of an undisclosed principal or *exceeds the scope of his authority*" and noted that the "[p]laintiff was aware of the principal—Great Lakes—the allegations within the [amended complaint] are consistent with the notion that Wager acted well beyond what Great Lakes authorized it to do." *Id.* (quoting *Francis*, 26 V.I. at 186).

[¶45] Here, the Plan and the ASA limit Meritain's scope of authority. The Plan provides that the Hospital has "maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding . . . eligibility for benefits . . . , to decide disputes . . . , and to decide questions of Plan interpretation." The Plan also states that "The Plan is administered by the Plan Administrator [defined as the Hospital]. The Plan Administrator has retained the services of the Third-Party Administrator [Meritain] to provide certain claims processing and other ministerial services." Under the ASA, the Hospital delegated to Meritain "only those powers and responsibilities with respect to the Plan which are specifically enumerated herein. Any function not specifically delegated to and assumed by Meritain pursuant to this Agreement shall remain the sole responsibility of [the Hospital]." The ASA enumerates specific "administrative services" assigned to Meritain.

[¶46] The record indicates that Meritain's participation in the claims process far exceeded "ministerial" or "administrative" services described in the Plan. Mr. Peterson was required to submit his claims to Meritain. Meritain determined whether his claims would be

16

approved or denied. Meritain paid approved claims and notified claimants of denied claims. Meritain decided two levels of appeal, with no apparent input or approval from the Hospital. There is no evidence that the Hospital had any role in these decisions or that Meritain ever communicated its decisions on Mr. Peterson's claims to the Hospital. *Supra* ¶¶ 8, 12. Meritain does not deny that it did not communicate its claims decisions to the Hospital. This raises questions of fact about Meritain's assumption of duties and whether it exceeded its scope of authority, under the Plan and the ASA.

[¶47] If Meritain acted as the Hospital's agent and acted beyond the scope of its authority, here, as in *Halliday*, it may be held liable for breach of contract. Accordingly, summary judgment is not warranted on Mr. Peterson's breach of contract claim.

### III. Is Meritain entitled to summary judgment on Mr. Peterson's third-party beneficiary claim for breach of the ASA?

[¶48] Mr. Peterson's second cause of action asserts that Meritain breached the ASA, (an agreement between Meritain and the Hospital only) and, because Mr. Peterson was a third-party beneficiary of that contract, he can recover damages for that breach.

### A. Third-Party Beneficiary Rights to Sue for Breach of Contract in Wyoming

[¶49] Contracts are "often made in which one party's performance [is] directed to a third party, not a party to the contracting process; that is, not in privity with the contract." 13 Samuel Williston, *Treatise on the Law of Contracts* § 37:1, at 7–9 (Richard A. Lord ed., 4th ed. 2013). "Over time, . . . th[e] traditional view [that strangers to a contract have no rights under it] was abandoned, and an exception to the need for privity was developed through the doctrine of third party beneficiaries." *Id.* at 12–13 (footnotes omitted).

[¶50] In Wyoming, a promise may be made between two parties for the benefit of a third party and:

> **[A] third-party beneficiary may enforce his rights under a contract**, although not a party to nor specifically mentioned in the contract; but there is more to it than that. An outsider claiming the right to sue must show that it was intended for his direct benefit. Otherwise he may be only an incidental beneficiary because the compelling provisions of a contract require that his claims be satisfied in order to protect another. However, an incidental beneficiary acquires no right of action against the promisor or promisee.

*Bear v. Volunteers of Am., Wyoming, Inc.*, 964 P.2d 1245, 1252 (Wyo. 1998) (emphasis added) (quoting *Wyoming Mach. Co. v. U.S. Fid. & Guar. Co.*, 614 P.2d 716, 720 (Wyo.

1980) (citing *Peters Grazing Ass'n v. Legerski*, 544 P.2d 449 (Wyo. 1975) and *Graham & Hill v. Davis Oil Co.*, 486 P.2d 240 (Wyo. 1971))). "If the terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person" and that person is an intended beneficiary. 13 Williston, *supra*, at 111. The Restatement (Second) of Contracts sets forth a test for determining whether a third person is an intended beneficiary:

> (1)  Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
>> (a)  the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>>
>> (b)  the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2)  An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302 (Am. L. Inst. 1981); *Cordero Mining Co. v. U.S. Fid. & Guar. Ins. Co.*, 2003 WY 48, ¶ 14, 67 P.3d 616, 622 (Wyo. 2003) (applying the Restatement (Second) of Contracts § 302 test for determining whether a third person was an intended third-party beneficiary of a contract); *Richardson Assocs. v. Lincoln-Devore, Inc.*, 806 P.2d 790, 807 (Wyo. 1991) (same); *Bear*, 964 P.2d at 1252 (same).

[¶51]  "When third-party beneficiary claims are reviewed, the real question is whether the contracting parties intended the contract to be for the direct benefit of a third party"; "absent evidence of such intent, the party is an incidental beneficiary with no enforceable rights under the contract." *Cordero Mining*, ¶¶ 9, 12, 67 P.3d at 621. In determining the parties' intent to contract for the benefit of a third party, courts "can and must" look to the terms of the contract and surrounding circumstances, including "facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract." *Id.* ¶ 15, 67 P.3d at 623.

**B.    Are there questions of fact as to whether Mr. Peterson was a third-party beneficiary of the ASA?**

[¶52]  Count II of Mr. Peterson's third amended complaint alleges that Mr. Peterson was a third-party beneficiary under the ASA, the terms of which were breached by Meritain,

18

and Mr. Peterson has been damaged by Meritain's breach in the amount of $207,423.67. In its motion for summary judgment, Meritain argued that Mr. Peterson was not a third-party beneficiary to the ASA and, therefore, could not sue for a breach of that agreement. The district court agreed, concluding that Mr. Peterson was not a third-party beneficiary as a matter of law. Mr. Peterson argues, at a minimum, there is a genuine issue of material fact as to whether insureds under the Plan are third-party beneficiaries to the ASA.

[¶53]   On summary judgment, Meritain has the initial burden of showing no genuine issue of material fact existed on the question of whether Mr. Peterson was an intended third-party beneficiary of the ASA. The ASA provides:

> 7.11 <u>No Third Party Beneficiaries</u>. Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon, or give to any third party (including without limitation, Plan Participants), any rights or remedies against any party hereto. . . .

This language is evidence of the parties' intent regarding the creation of intended third-party beneficiary status.

[¶54]   The burden then shifts to Mr. Peterson to demonstrate a material dispute as to the intent. Mr. Peterson contends that the ASA existed for Plan members' benefit. He sets forth the following terms in the ASA in support of his argument: Meritain and the Hospital agreed that Meritain would "administer and adjudicate" the Plan members' claims; Meritain would process Plan members' claims; Meritain would pay Plan members' claims; Meritain was obligated to "determine all questions of eligibility, status and coverage under the Plan"; Meritain was obligated to "decide disputes which may arise relative to a [Plan member's] rights"; Meritain was required to "provide an explanation of the adjudication of the Claim or reason(s) for the denial of benefits" to participants; and Meritain was required to "[r]efer to [the Hospital], for its exclusive and final resolution, any appeals from any denial of any of the Claims, pursuant to Section 503 of ERISA." Mr. Peterson argues that these provisions of the ASA "indicate[] it was intended to directly benefit the Plan Members." He contends that the Plan's purpose (of "provid[ing] for the payment or reimbursement of" employees' health care expenses and to "protect [employees and their families] by offsetting some of the financial problems that may arise from an Injury or Illness") could "not be carried out if Meritain failed to perform its duties under the ASA."

[¶55]   Meritain urges the Court to ignore the context in which the ASA was executed and the acts it performed in its role as a third-party administrator. Meritain argues that the Court must look only to the four corners of the ASA, and, if its language is unambiguous, we must conclude that there was no intent to create a third-party beneficiary. Meritain cites *Cordero Mining* in support of its argument.

19

[¶56] In *Cordero Mining*, we held that the parties' intention to create a third-party beneficiary "is to be gleaned from a consideration of **all of the contract and the circumstances surrounding the parties** at the time of its execution." *Cordero Mining*, ¶ 14, 67 P.3d at 622 (emphasis added) (quoting *Richardson*, 806 P.2d at 809). Courts look to "surrounding circumstances, facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract." *Id.* ¶ 15, 67 P.3d at 623; *see also Ultra Res., Inc. v. Hartman*, 2010 WY 36, ¶ 22, 226 P.3d 889, 905 (Wyo. 2010) ("Courts should consider the circumstances surrounding execution of the agreement to determine the parties' intention, even in reviewing unambiguous contracts.").

[¶57] We agree that the language contained in the ASA was unambiguously drafted to avoid creating intended third-party beneficiaries. Nevertheless, the ASA, as a whole, and the circumstances surrounding its execution (including the adoption of the Plan, which was also drafted by Meritain), create a question of fact as to whether the Hospital and Meritain intended to benefit Plan Participants.

## C. Did Meritain's and the Hospital's course of conduct modify the terms of the ASA?

[¶58] If a factfinder determines that Mr. Peterson was a third-party beneficiary under the ASA, it must then examine the terms of the ASA and decide whether those terms were breached.

[¶59] Meritain argues its agreement with the Hospital is established exclusively by the ASA. Mr. Peterson contends that the parties modified the ASA by their course of conduct to allow Meritain to process his claims and appeals. Meritain denies that there was any course of conduct modification of the ASA and points to its provisions that declare: "No Oral Modification. No provision of this Agreement may be amended, augmented or in any way modified except in a writing signed by a duly authorized representative of each of the parties." Mr. Peterson argues that despite the ASA's prohibition on oral modification and despite ASA limitations on Meritain's role, Meritain assumed the role of deciding claims and appeals, a role which had been assigned to the Hospital in both the Plan and the ASA, and if the Hospital agreed to Meritain's augmented role, the ASA was modified.

[¶60] "[P]arties to a written agreement may orally waive or modify their rights under the agreement." *Terris v. Kimmel*, 2010 WY 110, ¶ 7, 236 P.3d 1022, 1025 (Wyo. 2010) (quoting *Keever v. Payless Auto Sales, Inc.*, 2003 WY 147, ¶ 12, 79 P.3d 496, 499 (Wyo. 2003)). Further, "a written agreement may be modified through course of conduct." *Id.* However, a party who asserts

> a written agreement was modified by the subsequent expressions or conduct of the parties must prove so by clear and convincing evidence. The question of whether the alleged

20

modification of the written agreement has been proved by the required quantum of evidence is one to be decided by the trier of fact.

*Keever*, ¶ 13, 79 P.3d at 499–500 (citing *Ruby Drilling Co. v. Duncan Oil Co.*, 2002 WY 85, ¶ 11, 47 P.3d 964, 968 (Wyo. 2002)).

[¶61] If Meritain undertook duties outside those addressed by the ASA, its course of conduct could have amended the terms of the ASA; and, if Mr. Peterson was a third-party beneficiary, Meritain could be liable for breach of the ASA, including any modifications, to the extent it failed to comply with the terms of the ASA.

## IV. Is Meritain entitled to summary judgment on Mr. Peterson's claim for breach of the covenant of good faith and fair dealing?

### A. Can insurance plan participants sue third-party administrators in bad faith, when there is no contract between the participants and the third-party administrator?

[¶62] "Insurance contracts are generally considered significantly different than most other types of contracts. In recognizing the special nature of the relationship between the parties to an insurance contract, courts have characterized the insurer-insured relationship as: Contractual, Special, Fiduciary, [and] Quasi-fiduciary." 14 Steven Plitt, Daniel Maldonado, Joshua D. Rogers & Jordan R. Plitt, *Couch on Insurance* § 198:7, at 198-22–198-24 (3d ed. 2020). This relationship has given rise to the recognition of a bad faith cause of action against insurance companies. In *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855, 858 (Wyo. 1990), this Court first permitted recovery, in tort, for breach of the implied covenant of good faith and fair dealing (or bad faith) based upon the special relationship created by the unequal bargaining power that an insurer has over an insured. "This bad faith tort covers both an insurer's obligation to investigate and its obligation to pay its insureds in appropriate situations." *Kirkwood v. CUNA Mut. Ins. Soc.*, 937 P.2d 206, 211 (Wyo. 1997).[10] Potential liability for bad faith has provided an incentive for

---

[10] To establish an insurer breached the implied covenant of good faith and fair dealing by denying payments, the insured is required to show: "(1) the absence of any reasonable basis for denying a claim for benefits; and (2) the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim for benefits."

*Bergantino*, ¶ 16, 500 P.3d at 256 (quoting *State Farm Mut. Auto. Ins. Co. v. Shrader*, 882 P.2d 813, 825 (Wyo. 1994)). An insured can also "maintain a tort claim for violation of the implied covenant of good faith and fair dealing even though the express terms of the insurance contract are honored by the insurer." *Id.* ¶ 18, 500 P.3d at 256 (citing *Hatch v. State Farm Fire & Cas. Co.*, 842 P.2d 1089, 1099 (Wyo. 1992)). "Even if the insurer has a 'fairly debatable' reason for not paying the claim, it is bad faith to 'go beyond a reasonable denial of the claim and engage in unreasonable or unfair behavior to gain an unfair advantage.'"

insurance companies to better control their practices and to protect their insureds' interests. *See, e.g.*, 3 Ronald J. Clark, Dianne K. Dailey & Linda M. Bolduan, *Law and Prac. of Ins. Coverage Litig.* § 28:2 (2021) ("From the insurer's perspective, the best strategy is not to be sued for bad faith in the first place. Bad faith can generally be avoided by using common sense in handling a claim.").

[¶63] Over time, insurance companies began outsourcing operations that they had traditionally performed in-house to third parties. These third parties (managing general agents, third-party administrators, and independent claims adjusters) perform tasks such as underwriting, billing, recordkeeping, and claims handling. As one commentator has explained:

> Many insurers have "outsourced" substantial parts of their operations, making [managing general agents, third-party administrators,] and independent adjusters de facto insurers, at least for purposes of these key tasks related to policy administration and claims handling. Despite their increasing importance, these intermediaries have historically been immune from claims by disgruntled policyholders . . . so long as the insurer for whom they work is known to the policyholder or there is no formal written contract between the downstream intermediary and the policyholder or other third party.
>
> . . . [W]ith reduced incentive to discharge their duties well, the other intermediaries frequently act negligently, recklessly, or even in bad faith, needlessly creating claims imbroglios that could be avoided . . . .

Jeffrey W. Stempel, *The "Other" Intermediaries: The Increasingly Anachronistic Immunity of Managing General Agents and Independent Claims Adjusters*, 15 Conn. Ins. L.J. 599, 602–03 (2009).

[¶64] This calls into question the extent of the responsibility, if any, of third-party administrators to insureds. Many courts have concluded that because third-party administrators have no privity of contract with the insured, they owe no duties to the insured. *See, e.g.*, *Sanchez v. Lindsey Morden Claims Servs., Inc.*, 84 Cal. Rptr. 2d 799, 801–02 (Ct. App. 1999); *Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 698 (Tex. 1994); *Gruenberg v. Aetna Ins. Co.*, 510 P.2d 1032, 1038–39 (Cal. 1973); *see also De Dios v. Indem. Ins. Co. of N. Am.*, 927 N.W.2d 611, 623–24 (Iowa 2019), *amended* (May 14, 2019)

---

*Id.* (quoting *Hatch*, 842 P.2d at 1099). "Thus, an insurer may be liable for its unreasonable, oppressive, and intimidating claims practices in investigating, handling, or denying a claim, even though the denial was appropriate." *Id.* ¶ 19, 500 P.3d 256–57 (citing *Hatch*, 842 P.2d at 1099 and *Shrader*, 882 P.2d at 828).

(refusing to recognize a bad faith claim against workers compensation third-party administrators because Iowa workers compensation statutes do not apply to third-party administrators). Other courts, however, have reasoned that in certain circumstances, third-party administrators owe the insured a duty of good faith and fair dealing and can be sued for breaching it. *See, e.g.*, *Wathor v. Mut. Assur. Adm'rs, Inc.*, ¶ 5, 87 P.3d 559, 561, *as corrected* (Okla. Jan. 22, 2004); *Dellaira v. Farmers Ins. Exch.*, 2004-NMCA-132, ¶ 13, 102 P.3d 111, 115; *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 468 (Colo. 2003), *as modified on denial of reh'g* (May 19, 2003); *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 797 (10th Cir. 1995) (third-party administrator could be liable for bad faith administration of claim); *Sparks v. Republic Nat'l Life Ins. Co.*, 647 P.2d 1127, 1137–38 (Ariz. 1982); *Scott Wetzel Servs., Inc. v. Johnson*, 821 P.2d 804, 811 (Colo. 1991); *see also Cont'l Ins. Co. v. Bayless & Roberts, Inc.*, 608 P.2d 281, 286–87 (Alaska 1980) (insurance adjuster could be held liable for negligence).

### 1. Wyoming Law

[¶65]  Whether an insurance plan participant can sue a third-party administrator for bad faith is a question of first impression in Wyoming. Meritain argues that the lack of a contract precludes any claim for the breach of the covenant of good faith and fair dealing.

[¶66]  In *Birt v. Wells Fargo Home Mortg., Inc.*, 2003 WY 102, ¶ 4–5, 75 P.3d 640, 646 (Wyo. 2003), the plaintiffs sued Wells Fargo when—after indicating a home construction loan would be forthcoming and encouraging them to sign a contract to build a new home—it denied their loan application. They asserted numerous causes of action, including breach of contract, breach of implied contract, and breach of the covenant of good faith and fair dealing. *Id.* ¶ 9, 75 P.3d at 647. We concluded that there was no express or implied contract between the plaintiffs and the bank. *Id.* ¶¶ 10–20, 75 P.3d at 647–50. Consequently, we held there could be no claim for breach of the covenant of good faith and fair dealing:

> Our conclusion that neither an express contract nor an implied-in-fact contract existed in this case leads inexorably to the further conclusion that Wells Fargo was entitled to summary judgment on the issue of its alleged breach of the implied covenant of good faith and fair dealing. **Without a contract, there is no basis for imposition of the implied covenant, whether in contract or in tort, because either cause of action arises out of the contractual relationship. The duty of good faith and fair dealing does not come into play until the parties have reached an agreement and does not bind them during their earlier negotiations.**

*Id.* ¶ 21, 75 P.3d at 650 (emphasis added) (citations omitted).

23

[¶67] Yet, we have recognized that tort duties and liabilities are not limited to contractual principles. In *Throckmartin*, we considered duties owed by real estate agents. We said:

> Contract principles that govern the parties to a contract are not controlling on claims against nonparty professionals whose duties arise in tort. **Our precedents reveal a recognition that tort duties and liabilities imposed by the legislatures and courts are supported by underlying social policies which require the imposition of obligations on a defendant to act reasonably for the protection of a plaintiff. By imposing tort duties, courts and legislatures have externally allocated the risks arising from certain relationships for the protection of the public.**

*Throckmartin v. Century 21 Top Realty*, 2010 WY 23, ¶ 19, 226 P.3d 793, 804 (Wyo. 2010) (emphasis added).

[¶68] We have recognized the tort of bad faith where the party alleging bad faith did not have privity of contract with the tortfeasor. *See, e.g.*, *Gainsco Ins. Co. v. Amoco Prod. Co.*, 2002 WY 122, ¶ 26, 53 P.3d 1051, 1061 (Wyo. 2002) ("a covenant not to execute in the settlement agreement between an insured and a claimant . . . does not bar the claimant, as assignee of the insured, from pursuing a claim against the insurer for third-party bad faith"); *Herrig v. Herrig*, 844 P.2d 487, 490 (Wyo. 1992) ("A cause of action for 'third party' bad faith will lie when a liability insurer fails in bad faith to settle a third-party claim within policy limits against its insured." (citing *W. Cas. & Sur. Co. v. Fowler*, 390 P.2d 602 (Wyo. 1964))).

[¶69] In *Long*, Great West Life and Annuity Insurance Company (Great West) administered a health insurance plan which was sponsored by the State of Wyoming. The plan's terms gave Great West "virtually total control and discretion in the administration of the plan and, when claims [were] denied, [the plan] provide[d] for an appeal procedure to Great West." *Long v. Great West Life & Annuity Ins. Co.*, 957 P.2d 823, 824 (Wyo. 1998). Great West provided a list of in-network physicians. *Id.* The plan provided for a utilization review by the Health Care Review Service (HCRS) to preauthorize treatment. Under the plan terms, surgery performed without preauthorization would result in a payment penalty. *Id.* at 824–25. Mr. Long's treating physician recommended back surgery for chronic pain, and he sought preauthorization for surgery. *Id.* HCRS declined to preauthorize his surgery and recommended steroid injections. *Id.* at 825. The anesthesiologist scheduled to deliver the steroid injections refused to do so, explaining that he could not ethically administer the injections because he believed they "would be of no physical benefit to Long and would involve some risk." *Id.* Long attempted repeatedly over a prolonged period to resolve the matter with Great West and received no response. *Id.* at 826. In the meantime, his condition deteriorated, and he had the surgery without the

24

necessary preauthorization. *Id.* He sued Great West alleging, among other things, breach of contract and bad faith. *Id.* The trial court granted summary judgment to Great West, ruling that Mr. Long had not exhausted his administrative remedies because the contract required him to file a grievance when his claim was denied. *Id.*

[¶70] On appeal, this Court held that the grievance procedure did not apply to the utilization review process under the terms of the insurance contract. *Id.* at 831. The Court also considered whether Long could assert his claim for bad faith. Great West had argued that it was "not the proper party to be sued" because "it was merely a claims processor performing ministerial functions for the employer, the State of Wyoming." *Id.* at 828–29. The Court recognized that under "federal law, a third-party plan administrator that performs ministerial functions is not subject to suit because the law does not define it as a 'fiduciary.'" *Id.* at 829 (citing *Santana v. Deluxe Corp.*, 920 F. Supp. 249, 253–54 (D. Mass. 1996)). However, an "administrator that exercises discretionary authority or discretionary control in the administration and management of the plan may qualify as a fiduciary." *Id.* The Court explained that the record did not clearly identify the relationship between HCRS and Great West. It concluded that because the plan provided that HCRS will determine whether treatment was medically necessary and the plan tasked Great West with duties such as providing the list of in-network physicians, and stated that Great West will determine medical necessity, "a genuine question of material fact exists as to whether the terms of the insurance contract issued to Long created a fiduciary relationship between him and Great West." *Id.* The Court also concluded there were "genuine issues of material fact regarding Great West's handling of Long's request for medical treatment through its utilization review process." *Id.* at 830–31.

[¶71] Important principles can be gleaned from *Long*. First, Great West was a third-party administrator—and the Court applied federal law stating that when "a third-party administrator" exercises discretionary authority or control, it assumes a fiduciary duty toward the insured.[11] Second, we "perceive[d] Long's other numerous causes of action as being in the nature of a claim for bad faith in handling and investigating his claim for appropriate medical treatment" and held that there were genuine issues of material fact regarding whether Great West is liable for breach of the covenant of good faith and fair dealing. *Id.* at 829–30. In other words, we found that a third-party administrator could potentially be liable for breach of the covenant of good faith and fair dealing, at least under the circumstances of that case.

---

[11] While the *Long* opinion does not cite the "federal law" upon which it relies, we assume it is referring to ERISA.

[¶72]  Nevertheless, the *Long* decision leaves unanswered questions,[12] and the Court did not establish a framework for determining when a third-party administrator could be liable for bad faith.

### 2.  Other Jurisdictions

[¶73]  We look to other jurisdictions for guidance.  Other courts imposing a duty of good faith and fair dealing on third-party administrators have done so when the third-party administrator performs many of the tasks of the insurance company and bears some of the financial risk of loss for the claim.  For example, in *Wolf*, the Tenth Circuit Court of Appeals concluded that under Oklahoma law, a third-party administrator could be liable for the bad-faith administration of claims.  The *Wolf* court explained that "the special relationship on which an insurer's duty of good faith is based results from the quasi-public nature of insurance, the unequal bargaining power between the insurer and insured, and the potential for an insurer to unscrupulously exert that power at a time when the insured is particularly vulnerable." *Wolf*, 50 F.3d at 797.  The court concluded that a determination of whether a third-party administrator owes the insured a duty of good faith "should focus more on the factual question of whether the administrator acts like an insurer such that there is a 'special relationship' between the administrator and insured that could give rise to a duty of good faith." *Id.*  There, the insurer retained "ultimate responsibility for benefit determination," but the third-party administrator assumed "the ordinary insurer role of investigating and servicing claims," and made benefit determinations "through at least two levels of appeal." *Id.* at 797–98.  In addition, the third-party administrator's share of the insurance premiums rose as losses decreased. *Id.* at 798.  The court concluded that, because the third-party administrator "had primary control over benefit determinations, and assumed some of the risk of these determinations," it "undertook many of the obligations and risks of an insurer." *Id.*  Accordingly, whether the third-party administrator should be subject to the duty of good faith was a question of fact precluding summary judgment. *Id.*

[¶74]  In *Wathor*, Oklahoma County offered employees health insurance through a self-funded plan.  The plan contracted with a third-party administrator to administer the plan.  The third-party administrator denied coverage to the plaintiff because of a pre-existing condition. *Wathor*, 87 P.3d at 561.  The plaintiff sued the third-party administrator, alleging it breached its duty of good faith when it administered the plan. *Id.*  The Oklahoma Supreme Court agreed with the test articulated in *Wolf*.  It held:

> In a situation where a plan administrator performs many of the tasks of an insurance company, has a compensation package that is contingent on the approval or denial of claims, and bears some of the financial risk of loss for the claims, the

---

[12] For example, the Court also did not discuss Mr. Long's breach of contract claim against Great West, nor did it address privity of contract.

26

administrator has a duty of good faith and fair dealing to the insured.

*Id.* at 562–63. However, because the third-party administrator in that case did not share the risk of loss, the Oklahoma Supreme Court affirmed summary judgment in favor of the third-party administrator on the plaintiff's bad faith claim. *Id.* at 563.[13]

[¶75] Similarly, in *Cary*, the Colorado Supreme Court imposed a duty of good faith and fair dealing on third-party administrators who ran a self-funded health insurance plan for the City of Arvada. The court held that when a "third-party administrator performs many of the tasks of an insurance company and bears some of the financial risk of loss for the claim, the administrator has a duty of good faith and fair dealing to the insured in the investigation and servicing of the insurance claim." *Cary*, 68 P.3d at 469. In *Cary* the City of Arvada had established a trust to oversee its insurance program, and the trust was staffed by volunteers who only met quarterly and had no "experience or expertise in handling insurance claims or making coverage decisions." The trust gave the third-party administrator "near-complete control over the administration of the Plan." *Id.* at 464. In addition, the third-party administrator had entered into a reinsurance agreement with the trust under which it agreed to reimburse the trust for certain payments. *Id.* The Colorado Supreme Court concluded that these facts were sufficient to support a claim of bad faith. *Id.* at 468–69.

[¶76] In *Dellaira*, a third party "directed, handled, administered, and adjusted all claims" arising from an automobile insurance policy issued by the insurer. The plaintiffs, insureds, sued the insurance company and the administrator, alleging bad faith (among other causes of action) in the handling of their claim for coverage. The administrator argued that there could be no bad faith cause of action against it because there was no contract. *Dellaira*, ¶¶ 1–3, 102 P.3d at 112–13. The *Dellaira* court disagreed:

---

[13] The *Wathor* court also addressed the argument that a third-party administrator does not owe a duty of good faith and fair dealing to the insured because that duty is non-delegable. *Wathor*, 87 P.3d at 562. The court concluded, "the imposition of a nondelegable duty on the insurer does not necessarily preclude an action by an insured against a plan administrator for breach of an insurer's duty of good faith." *Id.* In Colorado, the *Cary* court went a step further. It explained,

> [T]he existence of this non-delegable duty does not mean that a third-party claims administrator never has an independent duty to investigate and process the insured's claim in good faith. When the actions of a defendant are similar enough to those typically performed by an insurance company in claim administration and disposition, we have found the existence of a special relationship sufficient for imposition of a duty of good faith and tort liability for its breach—even when there is no contractual privity between the defendant and the plaintiff.

*Cary*, 68 P.3d at 466.

27

We do not see any sound reason why New Mexico should not permit pursuit of [a bad faith] claim where, as is suggested by the pleadings, an entity related to or pursuant to agreement with the insurer issuing the policy has control over and makes the ultimate determination regarding the merits of an insured's claim. . . . An entity that controls the claim determination process may have an incentive similar to that of an unscrupulous insurer to delay payment or coerce an insured into a diminished settlement. The entity acts as an insurer and is therefore bound within the special relationship created through the insurance contract. . . . An insured's expectations of good faith handling and ultimate determination of his or her claim for benefits by the insurer extends no less to an entity that both handles and determines the claim than to the insurer issuing the policy. Absent the prospect of damages for bad faith breach, [the entity performing claims determination] has no incentive to pay in good faith[.]

*Id.* ¶ 14, 102 P.3d at 115–16 (internal citations and quotation marks omitted). Unlike the courts in *Wolf*, *Cary*, and *Wathor*, the New Mexico appellate court in *Dellaira* did not consider a financial risk of loss to be necessary to establish a bad faith claim against the third-party administrator. *Id.*[14]

---

[14] Courts in Delaware, Arizona, Nevada, and South Dakota have also concluded that a third-party administrator can be liable for bad faith.

In *Sliney v. New Castle Cnty.*, the Superior Court of Delaware denied a motion to dismiss a bad faith claim against a third-party administrator because it concluded a question of material fact existed as to whether the third-party administrator acted sufficiently like an insurer and/or whether a joint venture existed, of which either would create a special relationship between the administrator and the insured. *Sliney v. New Castle Cnty.*, No. CV N19C-05-061 FWW, 2021 WL 1235204 (Del. Super. Ct. Mar. 31, 2021). Without any previous Delaware case law to follow, the court felt inclined to follow the reasoning of *Wolf* and *Cary* believing that following the traditional privity of contract approach did not account for the "current reality on the ground where insurers may essentially delegate all or substantially all their responsibilities under their health insurance plans to third-party administrator." *Id.* at *5–6.

In *Sparks*, the Supreme Court of Arizona looked past the lack of privity and held that a jury instruction on joint and several liability for bad faith was proper in regard to an insurer and its servicing agent because the business relationship between the two entities was such that they shared a community of purpose. *Sparks*, 647 P.2d 1127. Republic National Life Insurance's (Republic) servicing agent marketed and administered Republic's policy, issued certificates of coverage, collected premiums, and handled investigation and payment of claims. *Id.* at 1137–38. Given this, the court found that the two shared a common duty which warranted joint tort liability. *Id.*

Following *Sparks*, in *Farr v. Transamerica Occidental Life Ins. Co. of California*, the Court of Appeals of Arizona held that a third-party administrator could be liable for bad faith, despite missing some classic elements of a joint venture because the administrator collected claims and handled premiums with little involvement from the insurer. *Farr v. Transamerica Occidental Life Ins. Co. of California*, 699 P.2d

[¶77]  We adopt the reasoning set forth in these cases.  When a third-party administrator acts sufficiently like the insurer, it owes a duty to the insured to act in good faith, as if it were the insurer.

**B.      Are there genuine issues of material fact precluding summary judgment on Mr. Peterson's claim for breach of the covenant of good faith and fair dealing?**

[¶78]  Meritain contends that summary judgment on Mr. Peterson's bad faith claim should be upheld because the Plan precludes a conclusion that Meritain undertook to act as an insurer.  Meritain points to Plan language that "Meritain was retained as a 'Third Party Administrator to provide certain claims processing and other ministerial services'";[15] it is the Hospital, not Meritain, which the Plan established as the "plan sponsor," "plan administrator," and "plan fiduciary"; and the Plan states the Hospital has

> maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding . . . eligibility for benefits . . . , to decide disputes . . . , and to decide questions of Plan interpretation and those of fact and law relating to the Plan. The decisions of the Plan Administrator . . . will be final and binding on all interested parties.

[¶79]  Meritain would confine our review to the carefully worded language of the Plan.  Our inquiry is not so limited.  On summary judgment, once the movant brings forth evidence entitling it to judgment as a matter of law, the other party, in this case Mr. Peterson, may bring forth evidence raising factual questions.  W.R.C.P. 56.

[¶80] Mr. Peterson has alleged that Meritain assumed many of the duties that were assigned to the Hospital under the Plan.  During discovery, Meritain did not deny that it assumed these duties.  As in *Wolf*, Meritain provided a list of participating providers.  The Plan states that "[a] current list of Participating Providers is available, without charge, through the Third Party Administrator at www.myMERITAIN.com."  There is a question

---

376 (Ariz. Ct. App. 1984).  The court noted that the elements of a joint venture that were missing in the case before them (no proof of profit and loss sharing and no proof of joint right to control) were also missing in *Sparks*.  *Id.* at 386.  Therefore, with the business relationship being much the same as that in *Sparks*, there was no reason to depart from *Sparks'* holding. *Id.  See Albert H. Wohlers & Co. v. Bartgis*, 969 P.2d 949, 959 (Nev. 1998), *as amended* (Feb. 19, 1998) (insurance administrator who assumed functions of insurer could be liable for bad faith because its functions made it a joint venturer); *Tovares v. Gallagher Bassett Servs., Inc.*, 379 F. Supp. 3d 791, 807 (D.S.D. 2019) (the United States District Court for the District of South Dakota denied summary judgment seeking to dismiss bad faith claim against Gallagher Bassett Services, a third-party administrator, because it concluded the South Dakota Supreme Court would recognize a duty of good faith owed by a third-party administrator in Gallagher's circumstances).

[15] The Plan does not define "claims processing and other ministerial services."

of fact as to whether the Hospital retained "ultimate responsibility for benefit determination," or whether Meritain assumed "the ordinary insurer role of investigating and servicing claims," including whether Meritain made benefit determinations "through at least two levels of appeal." *See Wolf*, 50 F.3d at 797–98. There is no evidence in the record demonstrating that the Hospital had any role in any aspect of Meritain's denials of Mr. Peterson's claims and appeals. There is no evidence that Meritain ever communicated with the Hospital regarding Mr. Peterson's claims. Meritain's decision was final—there was no procedure by which Mr. Peterson could seek reconsideration or involve the Hospital after Meritain denied his appeals. These facts support Mr. Peterson's contention that Meritain assumed the Hospital's duties and, in fact, exercised complete control over the claims process.

[¶81] Meritain argues that it "does not underwrite any of the risk of the Plan and has no financial interest in the financial performance of the Plan" and, therefore, had no duty of good faith to Mr. Peterson. Language contained in the ASA proves otherwise. It states, "where Meritain provides direct services, through its employees and agents, to negotiate bills, reduce claim amounts, . . . or otherwise increase savings on behalf of the Plan, Meritain shall be entitled to retain a contingency fee . . . resulting from such services." Meritain acknowledges that this benefit accrued to it but argues this benefit is removed from the claims process and is not the type of monetary benefit considered by the courts in *Wolf*, *Cary*, and *Wathor*. This argument notwithstanding, market forces alone provide an incentive for third-party administrators to keep claim payments low. As one court explained, "As a rational market actor, an adjuster knows it could lose business with a carrier if claim payments are too high." *Halliday*, 2019 WL 3500913, at *12. We apply this logic to third-party administrators.

[¶82] We find there are genuine issues of material fact which preclude summary judgment on the question of whether Meritain acted sufficiently like an insurer to impose upon it a duty of good faith and fair dealing.

## V. Can Mr. Peterson recover punitive damages or attorney fees?

[¶83] The district court properly concluded that Mr. Peterson could not recover on his claim for punitive damages or attorney fees because none of his other claims survived Meritain's motion for summary judgment. *See Alexander v. Meduna*, 2002 WY 83, ¶ 40, 47 P.3d 206, 218 (Wyo. 2002) ("Punitive damages cannot be awarded when compensatory damages are not recoverable."); *Cline v. Rocky Mountain, Inc.*, 998 P.2d 946, 949 (Wyo. 2000) ("**A prevailing party** may . . . be reimbursed for his attorneys' fees when express statutory or contractual authorization exists for such an award." (emphasis added)). However, because we are reversing and remanding, the questions of punitive damages and attorney fees must also be remanded to the district court for a determination in accordance with the evidence introduced to the trier of fact.

## VI. Did the district court abuse its discretion when it did not impose sanctions for Meritain's conduct during discovery or when it denied Mr. Peterson's request for personnel files?

[¶84] Mr. Peterson appeals two district court rulings on discovery. He contends that the district court should have awarded sanctions for Meritain's failure to comply with the court's October 2018 discovery order. He also argues that the district court abused its discretion when it sustained Meritain's objection to the production of its personnel files.

### A. Meritain's Discovery Conduct

[¶85] Mr. Peterson asked the district court on three separate occasions to compel discovery. October 23, 2018, the district court ordered Meritain to identify the claims examiners and appeals analysts who denied Mr. Peterson's claims and appeals and to produce its procedure manuals, policies, and guidelines for processing claims and appeals. The district court awarded sanctions when it required Meritain to pay Mr. Peterson's attorney fees in conjunction with its September 2019 Order Granting Plaintiff's Motion to Compel Discovery and Attorney Fees. In its September 2020 ruling on Mr. Peterson's Motion to Compel Discovery, the district court, again, awarded sanctions.

[¶86] Following the October 23, 2018 order, Meritain, in its responsive supplemented discovery, stated that it "has been unable to identify the specific individuals rendering the decision" to deny Mr. Peterson's claims and appeals. Meritain also produced the "Meritain Health MAPS/DG System Claims Guide On-line 2003-2013" and the "Meritain Health MAPS/DG System Claims Guide On-line 2003-2014." Later, Meritain's claims manager and expert witness, Karen Welter, testified in her deposition that, contrary to Meritain's discovery responses, Meritain used an additional claims guide and Meritain could identify those employees involved in administering claims and appeals using its DG System. Mr. Peterson requested Meritain supplement its discovery responses with this information. Meritain failed to do so, and Mr. Peterson filed his Third Motion to Compel Discovery on May 12, 2020. This prompted Meritain to supplement its responses on May 26, 2020. It identified the claims examiner and the appeal analyst for Mr. Peterson's claims (Sandra Nelson and Kimberly Johnson), and provided the Trilogy Manual, (the additional claims guide that it failed to produce earlier). Mr. Peterson filed his "Motion for Order to Show Cause Why Sanctions for Disobeyance [*sic*] of This Court's Discovery Order Should Not Be Imposed" in which he sought sanctions for Meritain's delay in complying with the 2018 discovery order. The district court declined to impose sanctions.

[¶87] On appeal, Mr. Peterson contends that the district court abused its discretion when it did not order sanctions under W.R.C.P. 37(b)(2). Mr. Peterson points to Meritain's continual deficiencies—failure to properly attest to the truth of its responses, as required by W.R.C.P. 33(b)(1), "sustained pattern of delay" throughout the case, and the "severe[] prejudice[]" caused by the delay—to argue the district court abused its discretion.

[¶88] Wyoming Rule of Civil Procedure 37 provides a mechanism for a party to request the court to either compel discovery, *see* W.R.C.P. 37(a), or sanction a party who fails to comply with the court's discovery orders. *See* W.R.C.P. 37(b)–(f).[16] In *Groskop*, ¶¶ 48–

---

[16] Rule 37 states:

**Failure to make disclosures or to cooperate in discovery; sanctions.**

(a) *Motion for an Order Compelling Disclosure or Discovery. —*
(1) *In General. —* On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

. . . .

(b) *Failure to Comply with Court Order. —*
(1) *Sanctions Sought in the District Where the Deposition Is Taken.* — If the court where the discovery is taken orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court. If a deposition-related motion is transferred to the court where the action is pending, and that court orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of either the court where the discovery is taken or the court where the action is pending.
(2) *Sanctions Sought in the District Where the Action Is Pending. —*
(A) *For Not Obeying a Discovery Order.* — If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
(iii) striking pleadings in whole or in part;
(iv) staying further proceedings until the order is obeyed;
(v) dismissing the action or proceeding in whole or in part;
(vi) rendering a default judgment against the disobedient party; or
(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.
(B) *For Not Producing a Person for Examination.* — If a party fails to comply with an order under Rule 35(a) requiring it to produce another person for examination, the court may issue any

of the orders listed in Rule 37(b)(2)(A)(i)–(vi), unless the disobedient party shows that it cannot produce the other person.

(C) *Payment of Expenses.* — Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

(c) *Failure to Disclose, to Supplement an Earlier Response, or to Admit.* —

(1) *Failure to Disclose or Supplement.* — If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

(A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

(B) may inform the jury of the party's failure; and

(C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)–(vi).

(2) *Failure to Admit.* — If a party fails to admit what is requested under Rule 36 and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof. The court must so order unless:

(A) the request was held objectionable under Rule 36(a);

(B) the admission sought was of no substantial importance;

(C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or

(D) there was other good reason for the failure to admit.

(d) *Party's Failure to Attend Its Own Deposition, Serve Answers to Interrogatories, or Respond to a Request for Inspection.* —

(1) *In General.* —

(A) *Motion; Grounds for Sanctions.* — The court where the action is pending may, on motion, order sanctions if:

(i)  a party or a party's officer, director, or managing agent—or a person designated under Rule 30(b)(6) or 31(a)(4)—fails, after being served with proper notice, to appear for that person's deposition; or

(ii)  a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response.

(B) *Certification.* — A motion for sanctions for failing to answer or respond must include a certification that the movant has in good

49, 471 P.3d at 289, this Court affirmed the district court's award of sanctions—dismissing the matter with prejudice—following repeated discovery violations. There, the plaintiff had "refus[ed] to turn over documents, properly verify interrogatories, and prepare for the Rule 30(b)(6) deposition" and "refused to comply with two orders compelling discovery and two orders awarding attorney fees." *Id.* ¶¶ 45–46, 471 P.3d at 288–89. Before ordering sanctions, the district court considered the prejudice resulting from the plaintiff's conduct, whether the conduct was willful, and the numerous opportunities the plaintiff had been given to comply with discovery requests and orders. *Id.* In affirming the decision, we recognized that district courts are vested with broad discretion in their use of sanctions regarding discovery matters. *Id.* ¶ 47, 471 P.3d at 289 (quoting *Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1320 (10th Cir. 2011)).

---

faith conferred or attempted to confer with the party failing to act in an effort to obtain the answer or response without court action.

(2) *Unacceptable Excuse for Failing to Act.* — A failure described in Rule 37(d)(1)(A) is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c).

(3) *Types of Sanctions.* — Sanctions may include any of the orders listed in Rule 37(b)(2)(A)(i)–(vi). Instead of or in addition to these sanctions, the court shall require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

(e) *Failure to Preserve Electronically Stored Information.* — If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:

(A) presume that the lost information was unfavorable to the party;

(B) instruct the jury that it may or must presume the information was unfavorable to the party; or

(C) dismiss the action or enter a default judgment.

(f) *Failure to Participate in Framing a Discovery Plan.* — If a party or its attorney fails to participate in good faith in developing and submitting a proposed discovery plan as required by Rule 26(f), the court may, after giving an opportunity to be heard, require that party or attorney to pay to any other party the reasonable expenses, including attorney's fees, caused by the failure.

W.R.C.P. 37.

[¶89] Mr. Peterson argues that Meritain's failures to disclose the names of its claims and appeals administrators and to provide the Trilogy Manual "interfered with the judicial process" by involving the court in discovery disputes; "thwarted" his expert's ability to fully evaluate the case and prepare his opinion; and delayed the adjudication of this case. He also argues that Meritain's failures were culpable. Meritain, on the other hand, asserts that "none of this" resulted in "significant prejudice." It also claims it made an "honest mistake as to the identities of its analysts[] and had a good faith belief that the publicly available Trilogy Manual should not [have been] included in its initial production."

[¶90] "[T]he decision *whether and how* severely to sanction under Rule 37 rests securely within the district court's province." 8B Charles A. Wright et al., *Federal Practice and Procedure* § 2284, at 444 (3d ed. 2010) (emphasis added). A district court has "broad discretion, both in the mechanisms adopted to control discovery and in its selection of appropriate sanctions for violations of . . . discovery[.]" *Roemmich*, ¶ 22, 238 P.3d at 95 (quoting *Ruwart v. Wagner*, 880 P.2d 586, 592 (Wyo. 1994)). A court does not abuse its discretion if it could reasonably conclude as it did. *See supra* ¶¶ 14–15. The district court's decision declining to award sanctions was not unreasonable.

## B.     Meritain's Personnel Files

[¶91] In his written discovery requests, Mr. Peterson sought "the personnel files . . . , including any performance review and evaluations of[] all claims representatives, claims handlers, claims assistants or any of MERITAIN's other employees assigned to, or who otherwise worked on, the claims submitted by Plaintiff[]." Meritain objected to this request, stating this "request seeks documents irrelevant to the claims or defenses at issue in this action." Meritain's response to this request was the subject (among others) of Mr. Peterson's June 1, 2018 Motion to Compel Discovery. The district court ruled: "Meritain's objection to this request is sustained at this point in time, but the Court shall revisit this request *if Plaintiff can further demonstrate the need for those documents*." (Emphasis added.) After Mr. Peterson learned that Kimberly Johnson, the Meritain analyst who denied his initial appeal, had died, he requested the court "revisit" its prior ruling and to reconsider his request for production of the personnel files of Ms. Johnson and Sandra Nelson (another Meritain employee Mr. Peterson planned to depose). The district court denied Mr. Peterson's request and his subsequent motion to reconsider that ruling.

[¶92] On appeal, Mr. Peterson argues that the district court applied an improper standard when it held that he could only obtain discovery of the personnel files if he could show he needed them. Rule 26 of the Wyoming Rules of Civil Procedure sets forth the scope of discovery: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." W.R.C.P. 26 (b)(1). However, that scope is tempered by considerations of proportionality and need. Parties may obtain discovery if the evidence is:

> proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

W.R.C.P. 26 (b)(1). Our jurisprudence is clear, "District courts are vested with wide discretion on discovery matters." *McCulloh v. Drake*, 2005 WY 18, ¶ 16, 105 P.3d 1091, 1095 (Wyo. 2005); *Kidd v. Kidd*, 832 P.2d 566 (Wyo. 1992); *Inskeep v. Inskeep*, 752 P.2d 434 (Wyo. 1988). "Nonetheless, the court's discretion is not unlimited—reversal may be in order when the court's ruling rests on clearly untenable or unreasonable grounds." *McCulloh*, ¶ 16, 105 P.3d at 1095. The party challenging a district court's discovery decision has the burden to prove an abuse of discretion. *Herrick*, ¶ 11, 452 P.3d at 1280.

[¶93] "[P]ersonnel files often contain sensitive personal information, . . . and it is not unreasonable to be cautious about ordering their entire contents disclosed willy-nilly." *Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 648 (10th Cir. 2008). Because of the often-sensitive nature of information contained in personnel files, other courts have held that public policy "strongly disfavors" their discovery. *See, e.g.*, *Graham & Co., LLC v. Liberty Mut. Fire Ins. Co.*, No. 2:14-CV-02148-JHH, 2016 WL 1319697, at *8 (N.D. Ala. Apr. 5, 2016); *Coker v. Duke & Co.*, 177 F.R.D. 682, 685 (M.D. Ala. 1998). Consequently, the discovery of personnel files has been held to be permissible only if "(1) the material sought is 'clearly relevant' [to the parties' claims and defenses], and (2) the need for discovery is compelling because the information sought is not otherwise readily obtainable." *See In re One Bancorp Sec. Litig.*, 134 F.R.D. 4, 12 (D. Me. 1991) (quoting *In re Sunrise Sec. Litig.*, 130 F.R.D. 560, 580 (E.D. Pa. 1989), *decision clarified on denial of reconsideration*, 109 B.R. 658 (E.D. Pa. 1990)); *see also Coker*, 177 F.R.D. at 685.

[¶94] Mr. Peterson contends the personnel files would contain evidence such as the "training, education and experience" of the Meritain employees who processed his claims and appeals and would show whether "they had a financial incentive to deny claims and appeals." Meritain suggests that this information is available from other sources, such as employee depositions (or in the case of Ms. Johnson, a deposition of her supervisor) or interrogatories. We agree with Meritain. Mr. Peterson has not demonstrated that the information sought was exclusively available from the personnel records. He has not established the district court abused its discretion when it denied his motion to produce them. "[T]he Supreme Court has underscored 'the requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied, and the district courts should not neglect their power to restrict discovery [to protect] 'a party or person from annoyance, embarrassment, [or] oppression[.]'" *Regan-Touhy*, 526 F.3d at 648–49

(quoting *Herbert v. Lando*, 441 U.S. 153, 177, 99 S.Ct. 1635, 1649, 60 L.Ed.2d 115 (1979)).

[¶95]  While some discovery into personnel files might be relevant, the district court did not abuse its discretion when it denied wholesale discovery of the personnel files of the Meritain employees who processed Mr. Peterson's claims and appeals.

[¶96]  Given that we are remanding this matter and there are questions of fact that must be addressed, it may be that the district court will "revisit" the production of personnel files (or portions of those files):

> [C]ourts generally permit discovery of some portions of the personnel files of the claims representatives who were significantly involved with the underlying claim or case **if the plaintiff can articulate a sufficient connection between its bad faith theory and the information sought in the files**. This is an achievable standard in most cases, although certainly not all. Assuming there is a connection, and thus information in the files is relevant for discovery purposes, courts typically allow the discovery of job applications, compensation information, information on incentive awards and programs, performance evaluations related to claims handling, information regarding defense and indemnity goals imposed on claims personnel, information concerning the employees' qualifications, and materials reflecting professional discipline related to claims handling.

Douglas R. Richmond, *Recurring Discovery Issues in Insurance Bad Faith Litigation*, 52 Tort Trial & Ins. Prac. L.J. 749, 794–95 (2017) (emphasis added) (footnotes omitted).  The district court, in its discretion, can evaluate whether certain documents in the personnel files—performance evaluations which might laud employees for denying claims, or an employee compensation structure that rewards claim denial—ought to be produced.  We note the district court has options to assist in protecting sensitive information such as in-camera review or protective orders.

## CONCLUSION

[¶97]  There are genuine issues of material fact precluding summary judgment on Mr. Peterson's breach of contract claim (including whether Meritain was the Hospital's agent and, if so, the extent of its authority), and his third-party beneficiary claim for breach of the ASA (including whether Meritain and the Hospital modified the terms of the ASA, and if so, whether he was a third-party beneficiary).  There are also genuine issues of material fact precluding summary judgment on Mr. Peterson's claim for breach of the covenant of

good faith and fair dealing.  Finally, the district court did not abuse its discretion when it did not impose sanctions for Meritain's discovery conduct or when it denied Mr. Peterson's request for production of personnel files.  We reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.